# IN RE ANNESSA J.*
## (SC 20614)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

Pursuant to statute (§ 46b-121 (b) (1)), "[i]n juvenile matters, the Superior
Court shall have the authority to make and enforce such orders directed
to parents . . . as the court deems necessary or appropriate to secure
the welfare, protection, proper care and suitable support of a child
subject to the court's jurisdiction or otherwise committed to or in the
custody of the Commissioner of Children and Families."

Pursuant further to this court's decision in *In re Ava W.* (336 Conn. 545),
a trial court has the authority to consider, at the time it determines
whether to terminate a parent's parental rights, the parent's motion for
posttermination visitation with the parent's child or children, and this

* In accordance with the spirit and intent of General Statutes § 46b-142
(b) and Practice Book § 79a-12, the names of the parties involved in this
appeal are not disclosed. The records and papers of this case shall be open
for inspection only to persons having a proper interest therein and upon
order of the Appellate Court.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3)
(2018), as amended by the Violence Against Women Act Reauthorization
Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49; we decline to identify
any person protected or sought to be protected under a protection order,
protective order, or a restraining order that was issued or applied for, or
others through whom that person's identity may be ascertained.

Furthermore, in accordance with our policies of protecting the privacy
interests of victims of family violence or sexual assault, we decline to identify
the victim or others through whom the victim's identity may be ascertained.
See General Statutes § 54-86e.

343 Conn. 642　　　　JUNE, 2022　　　　643

In re Annessa J.

authority originates from the trial court's authority to make and enforce orders pursuant to § 46b-121 (b) (1).

The petitioner, the Commissioner of Children and Families, sought to terminate the respondents' parental rights with respect to their minor child, A. Because of the COVID-19 pandemic, the trial on the termination petition was held remotely via Microsoft Teams. During that trial, the respondents filed motions seeking visitation with A in the event the trial court terminated their parental rights. At the conclusion of the trial, the trial court rendered judgment terminating the respondents' parental rights and denied the respondents' motions for posttermination visitation. In ruling on the respondents' motions, the trial court determined that the best interest of the child standard was not the correct standard under § 46b-121 (b) (1) and that posttermination visitation was not required for A's well-being, welfare, protection, proper care or suitable support. The respondents appealed to the Appellate Court, which upheld the trial court's termination of the respondents' parental rights but reversed the trial court's denial of the respondents' motions for posttermination visitation. The Appellate Court concluded that the trial court had failed to apply the correct standard under § 46b-121 (b) (1) and this court's holding in *In re Ava W.* when it ruled on the respondents' motions for posttermination visitation. Specifically, the Appellate Court determined that this court's decision in *In re Ava W.* did not purport to reject the best interest of the child standard and that the trial court had failed to consider whether posttermination visitation was necessary or appropriate to secure the welfare, protection, proper care and suitable support of A, taking into account, inter alia, the traditional best interest analysis. On the granting of certification, the respondent mother appealed and the petitioner cross appealed to this court. *Held*:

1. The respondent mother's unpreserved state and federal constitutional claims relating to the virtual nature of the termination of parental rights trial were unavailing, and, accordingly, this court upheld the Appellate Court's judgment insofar as it affirmed the trial court's judgment terminating the respondents' parental rights:

   a. The Appellate Court correctly concluded that the respondent mother had failed to establish that she had a fundamental right under article first, § 10, and article fifth, § 1, of the Connecticut constitution to an in person courtroom trial on the petition to terminate her parental rights: the text of those constitutional provisions was silent as to whether trials must be conducted in person, our courts have never had occasion to interpret either provision as imposing such a requirement, and the respondent mother did not cite any authority or provide any historical analysis to support the proposition that those constitutional provisions require an in person trial for the termination of parental rights; moreover, the open courts provision of article first, § 10, does not relate to the right of physical appearance but was intended to preserve the common-law rights of litigants to obtain redress for injuries to their persons, property,

In re Annessa J.

or reputation, to prohibit the state from imposing unreasonable charges on litigants for using the courts, and to end the corrupt practice of demanding gratuities for the giving or withholding of decisions in pending cases; furthermore, prior case law generally references article fifth, § 1, for the proposition that the legislature is responsible for establishing certain lower courts and defining their jurisdiction, and does not support the proposition that a termination of parental rights trial must be conducted in person, and this court had previously held in *In re Juvenile Appeal (Docket No. 10155)* (187 Conn. 431) that the trial court in that case did not violate the respondent's constitutional rights by conducting a termination of parental rights trial while the respondent participated via telephone instead of in person.

b. The Appellate Court correctly concluded that the record was inadequate to review the respondent mother's unpreserved claim that she was denied the right to physically confront the witnesses against her at the virtual termination of parental rights trial, in violation of the due process clause of the fourteenth amendment to the United States constitution: even if this court agreed with the respondent mother that she had a constitutional right to confront the petitioner's witnesses in person in the absence of a compelling governmental interest sufficient to curtail that right, this court had no factual record or factual findings on which to base a determination of whether that right was violated or whether the trial court had correctly concluded that the government's interests were sufficiently great to warrant conducting the trial virtually; moreover, because the respondent mother objected to the trial being conducted virtually on the basis that doing so would interfere with her ability to present evidence and the trial court's ability to weigh such evidence, the trial court was not alerted to the right to confrontation issue and did not have occasion to make findings of fact regarding the threat posed by the COVID-19 pandemic and whether that threat was sufficiently compelling to curtail any constitutional right to confrontation, and it would be unfair to the petitioner for this court to reach the merits of the respondent mother's claim by assuming that the factual predicates to her claim have been met.

2. The Appellate Court improperly expanded the standard set forth in *In re Ava W.* for deciding motions for posttermination visitation and improperly reversed the trial court's rulings on the respondents' motions for posttermination visitation on the ground that the trial court had failed to comply with that standard: although one sentence in the court's decision in *In re Ava W.* may have suggested that trial courts, in ruling on a motion for posttermination visitation, must decide whether such visitation is in the best interest of the child, the court did not intend that sentence, in isolation, to broaden the applicable standard to include a best interest of the child analysis, and this court read the entire decision in *In re Ava W.* to hold that trial courts must adhere to the necessary or appropriate standard set forth in § 46b-121 (b) (1) rather than the best

343 Conn. 642 JUNE, 2022 645

In re Annessa J.

interest of the child standard when ruling on motions for posttermination visitation; moreover, contrary to the respondent mother's claim that this court must presume that the legislature intended to incorporate the best interest of the child standard into § 46b-121 (b) (1) by virtue of that statute's use of the word "welfare," insofar as the legislature enacted § 46b-121 (b) (1) against the backdrop of common-law history equating the child's welfare with the child's best interest, the legislature frequently has used the term "best interest of the child" and similar terms in statutes that appear in the same chapter as § 46b-121, and, therefore, if the legislature had intended to incorporate the best interest of the child standard into the necessary or appropriate standard set forth in § 46b-121 (b) (1), it would have used the words "best interest of the child" instead of, or in addition to, "welfare"; furthermore, this court concluded that the necessary or appropriate standard is purposefully more stringent than the best interest of the child standard, as, under the former standard, a trial court must find that posttermination visitation is necessary or appropriate, meaning "proper," to secure the child's welfare; in the present case, the Appellate Court incorrectly concluded that the trial court had held the respondents to a more exacting legal standard than the one set forth in *In re Ava W.*, as the trial court's specific references to the standard set forth in *In re Ava W.*, made throughout the relevant portion of its memorandum of decision, and its explicit consideration of at least one factor, enumerated in *In re Ava W.*, that a trial court may consider in determining whether posttermination visitation is necessary or appropriate for the child's well-being, indicated that the trial court applied the correct legal standard in ruling on the respondents' motions for posttermination visitation, and, because the trial court correctly articulated the necessary or appropriate standard and stated that posttermination visitation was "not required" only after it determined that the respondents had not satisfied their burden of proving that such visitation was necessary or appropriate to secure A's welfare, the trial court understood that it was required to determine whether posttermination visitation was either necessary (i.e., required) or appropriate.

(*Three justices concurring separately in two opinions*)

Argued November 18, 2021—officially released June 20, 2022**

*Procedural History*

Petition by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor child, brought to the Superior Court in the judicial district of Hartford, Juvenile Matters, and tried to the court, *Olear, J.*; judgment terminat-

** June 20, 2022, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

In re Annessa J.

ing the respondents' parental rights and decisions denying the respondents' motions for posttermination visitation; thereafter, the respondents filed separate appeals with the Appellate Court, *Bright, C. J.*, and *Alexander* and *Norcott, Js.*, which affirmed the judgment terminating the respondents' parental rights and reversed the trial court's decisions denying the respondents' motions for posttermination visitation; subsequently, on the granting of certification, the respondent mother appealed and the petitioner cross appealed to this court. *Reversed in part*; *judgment directed.*

*Albert J. Oneto IV*, assigned counsel, for the appellant-cross appellee (respondent mother).

*Evan O'Roark*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, *Clare Kindall*, solicitor general, and *Nisa Khan*, assistant attorney general, for the appellee-cross appellant (petitioner).

*Joshua Michtom*, assistant public defender, for the cross appellee (respondent father).

*Opinion*

McDONALD, J. The Appellate Court reversed the trial court's denial of the respondent parents' motions for posttermination visitation on the ground that the trial court applied an incorrect legal standard when it considered those motions. See *In re Annessa J.*, 206 Conn. App. 572, 575–76, 260 A.3d 1253 (2021). The Appellate Court, however, did affirm the trial court's judgment terminating the respondents' parental rights, rejecting the respondent mother's claims relating to the virtual nature of the termination of parental rights trial. See id., 575. From these determinations, we are presented with a certified appeal and cross appeal.

In her appeal, the respondent mother, Valerie H., claims that the Appellate Court improperly rejected her

In re Annessa J.

unpreserved claim that the trial court had violated her rights under article fifth, § 1, and article first, § 10, of the Connecticut constitution by conducting the termination of parental rights trial virtually, via Microsoft Teams,[1] rather than in person. She also claims that the Appellate Court incorrectly determined that the record was inadequate to review her unpreserved claim that she was denied her right to physically confront the witnesses against her at the virtual trial, in violation of the due process clause of the fourteenth amendment to the United States constitution. In the cross appeal, the petitioner, the Commissioner of Children and Families, claims that the Appellate Court improperly expanded the standard for deciding motions for posttermination visitation and improperly reversed the trial court's rulings on those motions for failing to comply with that new standard.[2]

The record and the Appellate Court's decision set forth the pertinent facts and procedural history; see id., 576–80; which we summarize in relevant part. Valerie and the respondent father, Anthony J., first became involved with the Department of Children and Families in 2009, when their daughter, Annessa J., was three years old. The department removed Annessa from the care of her parents because it was concerned about intimate partner violence between the respondents and because they had provided inadequate supervision of Annessa. The trial court subsequently adjudicated Annessa neglected and ordered that she be committed to the care and custody of the petitioner. Thereafter, in 2010, the department reunified Annessa with the

---

[1] Microsoft Teams is "collaborative meeting [computer software] with video, audio, and screen sharing features." Connecticut Judicial Branch, Connecticut Guide to Remote Hearings for Attorneys and Self-Represented Parties (November 23, 2021) p. 5, available at https://jud.ct.gov/HomePDFs/ConnecticutGuideRemoteHearings.pdf (last visited June 15, 2022).

[2] The attorney for the minor child, Annessa, adopted the petitioner's brief and all of her legal arguments.

respondents. At that time, the respondents also reunited and began living together with Annessa.

In November, 2017, the department received a report alleging that Anthony had sexually abused Annessa and that Valerie had physically neglected her. Valerie recounted that she was unaware of the sexual abuse until July, 2017, when Anthony admitted to her that "he had touched Annessa's genitals over her underpants in order to teach her a lesson." (Internal quotation marks omitted.) Id., 577. As a result, Valerie asked Anthony to leave the apartment. After the department was informed about the alleged sexual assault, it made efforts to have Valerie place Annessa in therapy. Valerie, however, would not commit to doing so.

Several weeks after leaving Valerie's apartment, Anthony returned and kicked in the door to the apartment, for which he was arrested. Thereafter, one of several protective orders was issued against Anthony, and he subsequently pleaded guilty to numerous charges as a result of this arrest. He received a sentence of one year of incarceration, execution suspended, and two years of probation.

Annessa later reported that Valerie would leave her alone for days at a time, that she would not know where Valerie was during those times, and that the apartment had no heat or electricity. During a forensic interview in December, 2017, Annessa also confirmed that Anthony had "touched her 'bikini area' over her underwear." Id.

Throughout the course of the department's investigation, Valerie refused to cooperate with the department to provide services for Annessa. As a result, in January, 2018, the petitioner filed a petition alleging that Annessa had been neglected. After invoking a ninety-six hour administrative hold on Annessa, the petitioner filed an ex parte motion for an order of temporary custody. The trial court issued the order of temporary custody, and

In re Annessa J.

it was thereafter sustained. In July, 2018, Annessa was adjudicated neglected and committed to the custody of the petitioner. Annessa was placed in foster care with the woman who had been Valerie's foster mother years earlier. Annessa has bonded with the foster mother and has expressed a desire to remain in the custody of the foster mother.

The respondents "were given specific steps to facilitate reunification with Annessa, including addressing mental health issues, parenting deficiencies, and intimate partner violence . . . ." Id., 578. Anthony was also ordered to address the sexual abuse of Annessa through counseling. Valerie failed to cooperate with the department throughout its investigation. For his part, Anthony missed several administrative case review appointments but otherwise participated in counseling. He was not, however, initially cooperative about discussing the sexual abuse of Annessa with his therapist.

Given the respondents' lack of progress, in November, 2019, the petitioner filed a petition seeking to terminate their parental rights as to Annessa. Trial on the termination petition was originally scheduled for March, 2020, but was delayed due to the COVID-19 pandemic and the temporary suspension of most trials. In light of the pandemic, a virtual trial was ultimately held in September and October, 2020, via Microsoft Teams. During the trial, the respondents both filed motions asking that, in the event the trial court terminated their parental rights, the court order visitation to continue with Annessa posttermination.

In its memorandum of decision, the trial court found that the department had made reasonable efforts to reunify each of the respondents with Annessa and that neither parent was able or willing to benefit from reunification efforts. The court also determined that such efforts at reunification were no longer appropriate. In

In re Annessa J.

accordance with General Statutes § 17a-112 (j) (3) (B), the court also found that the petitioner had "proven by clear and convincing evidence the 'failure to rehabilitate' ground for termination of the respondents' parental rights." Id., 579. The court also considered the seven statutory factors enumerated in § 17a-112 (k) and concluded that termination of the parental rights of both respondents was in Annessa's best interest.

In its memorandum of decision, the trial court also considered the respondents' motions for posttermination visitation. The court found that "neither [Valerie] nor [Anthony] . . . met their burden [of] prov[ing] [that] posttermination visitation for such parent is necessary or appropriate to secure the welfare, protection, proper care and suitable support of [Annessa]." The court noted that Anthony and Annessa had a good visiting relationship but found that posttermination visitation with Valerie or Anthony was "not required for [Annessa's] well-being, welfare, protection, proper care or suitable support." Accordingly, the court denied both of the respondents' motions.

Thereafter, the respondents separately appealed to the Appellate Court. Valerie raised several unpreserved claims of error pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). Specifically, she claimed, among other things, that the trial court "(1) violated her right to a 'public civil trial at common law' by conducting proceedings over the Microsoft Teams platform, rather than in court and in person, in violation of article fifth, § 1, and article first, § 10, of the Connecticut constitution, [and] (2) violated her right to due process of law by precluding her from confronting witnesses in court and in person when it conducted proceedings over the Microsoft Teams plat-

In re Annessa J.

form . . . ."[3] (Footnote omitted.) *In re Annessa J.*, supra, 206 Conn. App. 575. Additionally, both respondents argued that the trial court applied an incorrect legal standard when it considered their motions for posttermination visitation with Annessa. Id., 575–76.

The Appellate Court rejected each of Valerie's constitutional claims. See id., 575. The court explained that Valerie failed to establish that a party possesses a fundamental right under the Connecticut constitution to an in-court, in person termination of parental rights trial, rather than a trial conducted over a virtual platform, such as Microsoft Teams. Id., 585. Accordingly, the court concluded that Valerie's state constitutional claim was not reviewable because it failed under the second prong of *Golding*. Id. The Appellate Court also concluded that, because Valerie did not ask the trial court to hold an evidentiary hearing on the need for a virtual trial, the record was inadequate to review Valerie's unpreserved federal due process claim. Id., 587. The Appellate Court, however, agreed with the respondents that the trial court had "failed to consider the appropriate standard under [General Statutes] § 46b-121 (b) (1) and *In re Ava W.* [336 Conn. 545, 589, 248 A.3d 675 (2020)], namely, whether posttermination visitation is '*necessary or appropriate* to secure the welfare, protection, proper care and suitable support of [the] child,' taking into account the traditional best interest analysis and the type of additional factors identified in *In re Ava W.*" (Emphasis in original.) *In re Annessa J.*, supra, 206 Conn. App. 603. Accordingly, the Appellate Court reversed the trial court's denial of the respondents'

[3] On appeal before the Appellate Court, Anthony did not take issue with the virtual format of the trial but, instead, raised claims relating to the merits of the trial court's termination judgment. The Appellate Court affirmed the trial court's judgment with respect to these claims. See *In re Annessa J.*, supra, 206 Conn. App. 590–98. Anthony did not file a petition for certification to appeal from the Appellate Court's judgment, and, as a result, those claims are not at issue in this appeal.

motions for posttermination visitation and affirmed the trial court's judgment terminating the respondents' parental rights. Id.

Thereafter, Valerie filed a petition for certification to appeal, which we granted, limited to the following issues: (1) "Did the Appellate Court, in affirming the judgment of the trial court terminating the parental rights of [Valerie] following a trial conducted via the Microsoft Teams platform over [Valerie's] objection, incorrectly determine that [Valerie's] unpreserved claim that article first, § 10, and article fifth, § 1, of the Connecticut constitution guaranteed her the right to an in person courtroom trial of the kind that existed at common law in 1818 was not of constitutional magnitude under the second prong of *State* v. *Golding*, [supra, 213 Conn. 233]?" And (2) "[d]id the Appellate Court, in affirming the trial court's judgment, incorrectly determine, under the first prong of *Golding*, that the record was inadequate to review [Valerie's] unpreserved claim that she was denied the right to physically confront the witnesses against her at the virtual trial on the petition to terminate her parental rights, in violation of the due process clause of the fourteenth amendment to the United States constitution?" *In re Annessa J.*, 338 Conn. 904, 904–905, 258 A.3d 674 (2021). The petitioner filed a petition for certification to cross appeal, which we granted, limited to the following issue: "Did the Appellate Court properly expand the standard set forth in *In re Ava W.*, [supra, 336 Conn. 545], for deciding motions for posttermination visitation beyond the question of whether, under . . . § 46b-121 (b) (1), such visitation is 'necessary or appropriate' to secure the welfare of the child?" *In re Annessa J.*, 338 Conn. 905, 258 A.3d 675 (2021). We address each of these three claims in turn. Additional facts and procedural history will be set forth as necessary.

In re Annessa J.

I

We begin with Valerie's unpreserved state and federal constitutional claims relating to the virtual nature of the termination of parental rights trial. The following additional facts and procedural history are relevant to our review of these claims. As we previously noted, due to the COVID-19 pandemic, the trial on the termination petition was held virtually, via Microsoft Teams. Before the presentation of evidence on the first day of trial, Anthony's counsel objected to the trial court's conducting the trial via Microsoft Teams instead of in person, and Valerie's counsel joined in the objection. The basis for the objection by Anthony's counsel was that "[t]he standard of proof is higher [in a termination of parental rights case], the inability for the court to see the parties and the witnesses . . . as would be [the case] in live trials—you know, the inability to see [whether] someone else is in the room giving answers, or [whether] a document is in front of the witness to help [the witness] testify." Anthony's counsel also noted that "the fact finder has to be able to assess . . . the witnesses, their demeanor, and, again, we're on little squares, and I'm having a hard time seeing what people are doing." Similarly, Valerie's counsel argued that "[i]t is very important that [the trial court] is able to, as a fact finder—able to look in the eyes of the person and, you know, make an assessment whether or not they are being truthful, and whether or not, what they are saying, they really mean it."

Annessa—who was fourteen years old at the time—argued, through her counsel, that the trial should proceed via Microsoft Teams. Annessa's counsel explained that "[Annessa] would like permanency. She's in support of the [termination of parental rights] and adoption, and we really don't know how long this pandemic will last." Similarly, the petitioner's counsel also argued that the trial could proceed and that the virtual nature of

In re Annessa J.

the proceeding would not disadvantage any of the parties. The petitioner's counsel also emphasized that "this case was supposed to be tried at the very beginning of March, [2020], and [Annessa] has been in limbo for over two years at this point and has been waiting for [the] trial for quite some time."

After a brief recess, the trial court denied the respondents' oral motion objecting to the virtual format of the trial. The court explained that, during the recess, it "talked to the chief administrative judge for juvenile [matters], and she confirmed that there is nothing precluding the court from going forward. And, in fact, the court has been directed by the chief court administrator's office to proceed, whenever possible, to go forward with matters that are necessary, important, and appropriate. I do believe that the matter can be conducted appropriately virtually. We do have the Connecticut Guide to Remote Hearings [for Attorneys and Self-Represented Parties] that was promulgated by the Judicial Branch.[4] I intend to follow it." (Footnote added.) The trial court also rejected the respondents' claim that the virtual format would interfere with its ability to properly weigh the evidence. Specifically, the court explained: "I think that there is sufficient eye contact with people. If—frankly, if they were in court, we might have less . . . visual contact because they'd have to have masks on. This way, hopefully, they don't have to have one on because they should be alone in a room.

_____
[4] Due to the COVID-19 pandemic, the Judicial Branch began holding virtual hearings using Microsoft Teams in 2020. The Judicial Branch created the Connecticut Guide to Remote Hearings for Attorneys and Self-Represented Parties to "assist anyone who is preparing to participate in a remote court hearing through Connecticut's 'Remote Justice Virtual Courtroom.' This includes counsel, self-represented parties, and other necessary hearing participants, such as witnesses." Connecticut Judicial Branch, Connecticut Guide to Remote Hearings for Attorneys and Self-Represented Parties (November 23, 2021) p. 4, available at https://jud.ct.gov/HomePDFs/ConnecticutGuideR emoteHearings.pdf (last visited June 15, 2022).

And I think that's important in terms of evaluating credibility. I feel confident that I will be able to make the appropriate findings. If, at some point, I'm concerned that that is not the case, I will raise it. And I always have the ability to do something in the future, during this trial, if I feel that it's gone awry or that I'm not able to perform my judicial duties, but, at this point, I'm comfortable that I can, given the parameters of where we are today. I think, given the pandemic, it's important that we do try to go forward in the best manner possible. I think this is the best manner possible.''

After denying the respondents' motion, the trial court proceeded with the virtual trial. Over the course of trial, the court admitted nine full exhibits offered by Valerie, two by Anthony, and eighteen by the petitioner. The petitioner also presented the testimony of five witnesses, Valerie called three witnesses, Valerie testified on her own behalf, and Anthony called one witness. There were several technical issues throughout trial, such as background noise interrupting the audio of a witness and video ''freezing'' during an expert's testimony. In each instance, the trial court took corrective measures, including directing that a witness stop testifying until the background noise abated, directing an attorney to reposition her camera, and sending a new Microsoft Teams link when technical difficulties persisted. In keeping with its offer at the start of trial, the court also regularly paused the proceedings so that the parties could confer with their counsel. Additionally, at no time did the respondents ask for technical assistance or accommodations from the court. Relevant to Valerie's claims on appeal, in the trial court's memorandum of decision, the court noted that, ''[d]ue to the COVID-19 . . . pandemic, the trial [on the termination of parental rights petition] was conducted virtually. The court made every reasonable effort to allow counsel and the parties to confer with each other during the

In re Annessa J.

proceedings and to address technical issues that arose from time to time. Using the virtual technology, the court was able to assess the demeanor and credibility of the witnesses.''

A

We turn first to Valerie's claim that the Appellate Court incorrectly determined that her ''unpreserved claim that article first, § 10, and article fifth, § 1, of the Connecticut constitution guaranteed her the [unqualified] right to an in person courtroom trial of the kind that existed at common law in 1818 was not of constitutional magnitude under the second prong of . . . *Golding* . . . .''[5] (Citation omitted.) The petitioner disagrees with Valerie and contends, among other things, that the Appellate Court correctly concluded that Valerie failed to establish that she had a fundamental right under article first, § 10, and article fifth, § 1, to an in person trial. We agree with the petitioner.

Although she objected to the virtual format of the trial, Valerie concedes that she did not raise this claim before the trial court and, therefore, seeks review under *State* v. *Golding*, supra, 213 Conn. 239–40. Pursuant to *Golding*, ''a [respondent] can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the viola-

[5] Unlike her federal due process claim; see part I B of this opinion; Valerie's state constitutional claim is based on an alleged unqualified right to an in person trial. Specifically, she claims that the trial court violated her state constitutional rights by conducting a virtual trial, regardless of its reason for doing so. As a result, the record is adequate to review this claim because it does not require any factual predicates, and it is clear from the record that the trial was held virtually via Microsoft Teams. As we explain in part I B of this opinion, Valerie does not claim an unqualified right to physically confront the witnesses against her under the fourteenth amendment to the federal constitution.

tion of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the [respondent] of a fair trial; and (4) if subject to harmless error analysis, the [petitioner] has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) Id.; see *In re Yasiel R.*, supra, 317 Conn. 781 (modifying third prong of *Golding*). "The first two steps in the *Golding* analysis address the reviewability of the claim, [whereas] the last two steps involve the merits of the claim." (Internal quotation marks omitted.) *In re Azareon Y.*, 309 Conn. 626, 634– 35, 72 A.3d 1074 (2013).

In support of her claim, Valerie relies on article first, § 10, and article fifth, § 1, of the Connecticut constitution. Article first, § 10, provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay." Article fifth, § 1, provides: "The judicial power of the state shall be vested in a supreme court, a superior court, and such lower courts as the general assembly shall, from time to time, ordain and establish. The powers and jurisdiction of these courts shall be defined by law." The text of these constitutional provisions says nothing about whether trials must be conducted in person. Our courts have never had occasion to interpret either provision as imposing such a requirement. Nevertheless, Valerie contends that "article first, § 10, creates a right of the citizenry to a public civil trial of the kind that existed at common law in 1818," and "article fifth, § 1, creates a duty on the part of the Superior Court to find facts by observing firsthand the parties and witnesses in physical proximity to each other . . . ." Valerie, however, does not cite any authority or provide any historical analysis that supports the proposition that these constitutional provi-

In re Annessa J.

sions require an in person trial for the termination of parental rights.

With respect to article first, § 10, we note that Valerie's counsel conceded at oral argument before the Appellate Court that "a public trial is not constitutionally required in juvenile matters . . . ." *In re Annessa J.*, supra, 206 Conn. App. 586. With this concession, Valerie is left to argue that the "open courts" provision of article first, § 10, was intended to enshrine the right to appear physically and in person for trial, yet she provides no authority in support of that claim.[6] We find no suggestion in our prior cases or historical sources indicating that the provision has anything to do with a right of physical appearance. Instead, the rights preserved by that provision are a litigant's common-law rights to obtain redress "for an injury done to him in his person, property or reputation . . . ." Conn. Const., art. I, § 10; see, e.g., *Kelley Property Development, Inc.* v. *Lebanon*, 226 Conn. 314, 331, 627 A.2d 909 (1993) ("we have consistently interpreted article first, § 10, to prohibit the legislature from abolishing a right that existed at common law prior to 1818"); *Gentile* v. *Altermatt*, 169 Conn. 267, 286, 363 A.2d 1 (1975) ("[s]imply stated, all rights derived by statute and the common law extant at the time of the adoption of article first, § 10, are incorporated in that provision by virtue of being established by law as rights the breach of which precipitates a recognized injury, thus being exalted beyond the status of common-law or statutory rights of the type created subsequent to the adoption of that provision"), appeal dismissed, 423 U.S. 1041, 96 S. Ct. 763, 46 L. Ed. 2d 631 (1976). The provision also guarantees that any such remedy be provided "by due course of law, and right and justice administered without sale, denial or delay." Conn. Const., art. I, § 10. That language

---

[6] Valerie does not allege any procedural due process violation with regard to this claim.

343 Conn. 642 JUNE, 2022 659

In re Annessa J.

has been construed "as prohibiting the state from selling justice by imposing unreasonable charges on the litigants in the courts . . . and as ending the practice by a corrupt judiciary of demanding gratuities for giving or withholding decisions in pending cases." (Citation omitted.) *Doe* v. *State*, 216 Conn. 85, 97, 579 A.2d 37 (1990). Valerie points to no authority in which this court has interpreted article first, § 10, as imposing any requirements on how courts adjudicate cases, such as requiring that courts conduct trials in person, and we decline to do so.

The cases that Valerie relies on to support her claim with respect to article fifth, § 1, address the separation of powers among the three branches of government and stand for the proposition that it is the duty of the trial court—not an appellate court—to find facts.[7] See *Styles* v. *Tyler*, 64 Conn. 432, 449–50, 30 A. 165 (1894) ("The whole judicial power of the [s]tate is vested in the courts . . . . The 'Supreme Court of Errors' is not a supreme court for all purposes, but a supreme court only for the correction of errors in law . . . ."); see also *Nolan* v. *New York, New Haven & Hartford Railroad Co.*, 70 Conn. 159, 173–77, 39 A. 115 (1898) (discussing distinction between questions of fact and questions of law). Far from mandating the form a trial must take, *Styles* focused on explaining that "the evil which the people sought to prevent by article [fifth] of our [c]onstitution" was judicial power residing in the General Assembly. *Styles* v. *Tyler*, supra, 449. Case law generally references article fifth, § 1, for the proposition

---

[7] We recognize that "the ultimate decision [as to whether termination is justified] is intensely human. It is the judge in the courtroom who looks the witnesses in the eye, interprets their body language, listens to the inflections in their voices and otherwise assesses the subtleties that are not conveyed in the cold transcript." (Internal quotation marks omitted.) *In re Nevaeh W.*, 317 Conn. 723, 740, 120 A.3d 1177 (2015). Valerie, however, does not explain how the virtual format of the trial prevents a trial judge from finding facts and making credibility assessments.

In re Annessa J.

that the legislature is responsible for establishing certain lower courts and defining their jurisdiction. See, e.g., *Adams* v. *Rubinow*, 157 Conn. 150, 155–56, 251 A.2d 49 (1968); see also, e.g., *State* v. *Gomes*, 337 Conn. 826, 842–43, 256 A.3d 131 (2021). None of the cases Valerie relies on stands for the proposition that a termination of parental rights trial must be conducted in person.

Finally, we note that Valerie does not address the impact of this court's holding in *In re Juvenile Appeal (Docket No. 10155)*, 187 Conn. 431, 446 A.2d 808 (1982), on her claim. In *In re Juvenile Appeal (Docket No. 10155)*, this court held that, as applied to the facts of that case, the trial court did not violate the respondent father's constitutional rights by conducting a termination of parental rights trial while the respondent participated via telephone instead of in the physical presence of the judge deciding the case. See id., 435–41. We explained that "[w]e cannot . . . say that the lack of a visual image seriously disadvantaged the trial court in making its determination. . . . [L]imiting the opportunity to assess the respondent's demeanor to its auditory component seems to us to entail only the most marginal risk that the [trial court] would be misled in evaluating the respondent's credibility." Id., 438.

In light of the foregoing, we agree with the Appellate Court that Valerie failed to establish that there exists a fundamental right under article first, § 10, and article fifth, § 1, of the Connecticut constitution to an in person termination of parental rights trial.[8] Accordingly, we

[8] Other state appellate courts have concluded that trial courts may conduct termination of parental rights trials virtually or by telephone, as long as the court ensures that the technology functions properly and the parent can meaningfully participate. See, e.g., *People ex rel. R.J.B.*, 482 P.3d 519, 524–25 (Colo. App. 2021), cert. denied, Colorado Supreme Court, Docket No. 21SC115 (March 15, 2021); *In re T.J.*, Docket No. 1-21-0740, 2021 WL 4941511, *7–9 (Ill. App. October 21, 2021); *In re M.M.*, Docket No. 21A-JT-840, 2021 WL 4839067, *3–4 (Ind. App. October 18, 2021) (decision without published opinion, 176 N.E.3d 589); *In re A.H.*, 950 N.W.2d 27, 36 (Iowa App. 2020); *In re TJH*, 485 P.3d 408, 413–16 (Wyo. 2021).

conclude that Valerie's claim fails under the second prong of *Golding*.

B

We turn next to Valerie's claim that the Appellate Court incorrectly determined that "the record was inadequate to review [her] unpreserved claim that she was denied the right to physically confront the witnesses against her at the virtual trial on the petition to terminate her parental rights, in violation of the due process clause of the fourteenth amendment to the United States constitution.'' The petitioner contends, among other things, that the Appellate Court correctly concluded that the record was inadequate to review this unpreserved claim. We agree with the petitioner.

Valerie again concedes that she did not raise this claim before the trial court and, therefore, seeks review under *State* v. *Golding*, supra, 213 Conn. 239–40. See part I A of this opinion. Unlike her state constitutional claim, which did not require any factual predicates because she claimed an unqualified right to an in person trial, Valerie's federal constitutional claim is not based on an alleged unqualified right to confront the petitioner's witnesses in person under the fourteenth amendment to the United States constitution. Rather, Valerie claims that she had the right to do so "in the absence of evidence demonstrating the existence of a compelling governmental interest sufficient to curtail the right.'' Valerie thus acknowledges that there are certain countervailing governmental interests that may be sufficient to justify curtailing any constitutional right to in person confrontation. Indeed, to address the merits of Valerie's claim, this court would apply the three part test set forth in *Mathews* v. *Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). The third part of that test requires us to consider the governmental interests at stake. Id. In the present case, the trial court explained

In re Annessa J.

that, "[d]ue to the COVID-19 . . . pandemic, the trial [on the termination of parental rights petition] was conducted virtually." As a result, we would need to consider the specific factual circumstances surrounding the trial and the COVID-19 pandemic to properly evaluate Valerie's claim. As Valerie concedes, "[a]lthough the trial court referenced the COVID-19 public emergency as the reason for conducting the trial virtually, there was no actual evidence before the court that [SARS-CoV-2, the virus that causes COVID-19], threatened the health or safety of any of the persons involved in this particular case." It is for this reason that the record is inadequate to review Valerie's unpreserved federal due process claim. Even if this court were to assume that Valerie had a right to in person confrontation in the absence of compelling countervailing interests, this court has no factual record or factual findings on which to base a determination of whether that right was violated or whether the trial court correctly concluded that the government's interests were sufficiently great to warrant conducting the trial virtually. See, e.g., *In re Azareon Y.*, supra, 309 Conn. 637 (reviewing court was unable to determine whether trial court deprived respondent mother of her alleged right to less restrictive permanency plan in absence of factual record demonstrating that less restrictive permanency plan existed).

Valerie nevertheless argues that the lack of evidence in the record regarding "whether there was a compelling reason to curtail her right [to] physical confrontation was not her burden to overcome under the first prong of . . . *Golding*." We disagree.

During the trial, the petitioner and the trial court were never put on notice that Valerie objected to the virtual nature of the termination of parental rights trial on the basis that it violated her right to confront the petitioner's witnesses. Rather, the respondents objected to the trial being conducted virtually on the basis that

In re Annessa J.

doing so would interfere with their ability to present evidence and the trial court's ability to weigh that evidence. Because the trial court was not alerted to this right to confrontation issue, it did not have occasion to make findings of fact regarding the threat posed by the COVID-19 pandemic and whether that threat was sufficiently compelling to curtail any constitutional right to in person confrontation. "In such circumstances, the [petitioner] bears no responsibility for the evidentiary lacunae, and, therefore, it would be manifestly unfair to the [petitioner] for this court to reach the merits of the [respondent's] claim upon a mere assumption that [the factual predicate to her claim has been met]." (Emphasis omitted.) *State* v. *Brunetti*, 279 Conn. 39, 59, 901 A.2d 1 (2006), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007).

Not only would such an assumption be improper, but, because, "under the test in *Golding*, we must determine whether the [appellant] can prevail on his [or her] claim, a remand to the trial court would be inappropriate. The first prong of *Golding* was designed to avoid remands for the purpose of supplementing the record." (Emphasis omitted.) *State* v. *Stanley*, 223 Conn. 674, 689–90, 613 A.2d 788 (1992). The parties agree that there is an inadequate basis in the record for the trial court to determine whether the government's interests warrant conducting a virtual trial. Thus, in order to make the requisite findings, the trial court, on remand, would have to open the evidence. "In cases of unpreserved constitutional claims, this court consistently has refused to order a new trial when it would be necessary to elicit additional evidence to determine whether the constitutional violation exists." *In re Azareon Y.*, supra, 309 Conn. 639, citing *State* v. *Dalzell*, 282 Conn. 709, 721–22, 924 A.2d 809 (2007) (overruled in part on other grounds by *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123,

In re Annessa J.

84 A.3d 840 (2014)), *State* v. *Canales*, 281 Conn. 572, 582, 916 A.2d 767 (2007), *State* v. *Brunetti*, supra, 279 Conn. 59, 64, *State* v. *Daniels*, 248 Conn. 64, 80, 726 A.2d 520 (1999) (overruled in part on other grounds by *State* v. *Singleton*, 274 Conn. 426, 876 A.2d 1 (2005)), and *State* v. *Medina*, 228 Conn. 281, 301–302, 636 A.2d 351 (1994). Therefore, we agree with the Appellate Court that the record is inadequate for review of this claim.

II

We turn next to the petitioner's claim, raised on cross appeal, that the Appellate Court improperly expanded the standard set forth in *In re Ava W.*, supra, 336 Conn. 588–90, for deciding motions for posttermination visitation and improperly reversed the trial court's rulings on the respondents' motions for failing to comply with that standard. The respondents disagree with the petitioner and contend that the Appellate Court correctly concluded that the trial court had improperly applied a more exacting standard to their motions for posttermination visitation than was required. We agree with the petitioner.

The record and the Appellate Court's opinion set forth the following additional facts and procedural history relevant to our review of this claim. See *In re Annessa J.*, supra, 206 Conn. App. 598–600. During the termination of parental rights trial, the respondents timely filed motions for posttermination visitation with Annessa, citing this court's decision in *In re Ava W.* In ruling on the respondents' motions, the trial court concluded in relevant part that "neither [Valerie] nor [Anthony] . . . met their burden [of] prov[ing] [that] posttermination visitation for such parent is necessary or appropriate to secure the welfare, protection, proper care and suitable support of [Annessa]. [Valerie] avers that it is in the best interest of Annessa for visitation to continue. That

In re Annessa J.

is not the standard under . . . § 46b-121 (b) (1). . . .
Posttermination visitation by [Valerie] with Annessa is
not required for [Annessa's] well-being, welfare, protec-
tion, proper care or suitable support. [Valerie's] motion
is denied. . . . [Anthony] likewise avers [that] it is in
the best interest of Annessa for visitation to continue.
[Anthony] and Annessa do have a good visiting relation-
ship. However, that does not equate to a finding that
posttermination [visitation] is required for Annessa.
. . . Posttermination visitation by [Anthony] with
Annessa is not required for her well-being, welfare,
protection, proper care or suitable support. [Anthony's]
motion is denied.''

Thereafter, the respondents appealed to the Appel-
late Court, claiming that the trial court employed an
incorrect legal standard in ruling on their motions for
posttermination visitation. *In re Annessa J.*, supra, 206
Conn. App. 598. The Appellate Court agreed, concluding
that the trial court had failed to consider the appropriate
standard, as set forth in *In re Ava W.* Id., 603. The
Appellate Court reasoned that our decision in *In re Ava
W.* did not purport to reject the ''best interest of the
child'' standard but, instead, held that, ''when [a trial
court rules on] a motion for posttermination visitation
during a termination of parental rights case, the . . .
court's consideration of the traditional best interest of
the child is only part of the consideration of whether
such visitation is 'necessary or appropriate to secure the
welfare, protection, proper care and suitable support
of [the] child.' '' Id., 601. Consistent with this conclusion,
the Appellate Court determined that the trial court
applied an incorrect legal standard in ruling on the
respondents' motions for posttermination visitation
because it (1) ''improperly required [the respondents]
to establish that posttermination visitation was required
for Annessa's well-being''; (emphasis omitted) id., 602;
and (2) failed to consider ''whether posttermination
visitation is 'necessary or appropriate to secure the

In re Annessa J.

welfare, protection, proper care and suitable support of [the] child,' taking into account *the traditional best interest analysis* and the type of additional factors identified in *In re Ava W.*'' (Emphasis altered.) Id., 603. Accordingly, the Appellate Court reversed the trial court's denial of the motions for posttermination visitation and remanded the case for further proceedings on the respondents' motions. Id.

On cross appeal to this court, the petitioner argues that the Appellate Court improperly reversed the trial court's denial of the respondents' motions on the ground that the respondents had failed to prove that an order of posttermination visitation was "necessary or appropriate" to secure Annessa's welfare. Specifically, the petitioner contends that the Appellate Court improperly expanded the *In re Ava W.* standard by concluding that trial courts " 'should take a broader view of best interest' " in ruling on motions for posttermination visitation, "rather than adhering to the language set forth [in] § 46b-121 (b) (1)." The petitioner further argues that the Appellate Court incorrectly concluded that the trial court held the respondents to a more exacting standard than the "necessary or appropriate" standard insofar as the trial court had found that an order of posttermination visitation was "not required" after first finding that such an order was not "necessary or appropriate" for Annessa's welfare. According to the petitioner, the trial court applied the proper legal standard, and she, therefore, asks this court to reverse the judgment of the Appellate Court on this issue.

The respondents disagree with the petitioner, although they have differing interpretations of the Appellate Court's opinion.[9] Valerie argues that the Appellate Court

_____

[9] Anthony argues that the Appellate Court based its reversal solely on the trial court's purportedly erroneous application of a "required" standard, *not* on whether the trial court erroneously rejected the best interest of the child standard. We disagree.

In re Annessa J.

properly expanded the standard set forth in *In re Ava W.*, as it recognized that the "best interest of the child" standard is incorporated into a trial court's overall consideration of whether posttermination visitation is "necessary or appropriate" for the child's welfare. By contrast, Anthony argues that the Appellate Court did not purport to broaden the "necessary or appropriate" standard but, instead, correctly understood that, pursuant to *In re Ava W.*, the standard was already broad and inclusive. Notwithstanding these differing interpretations, both of the respondents claim that the Appellate Court correctly concluded that the trial court had applied an unduly narrow legal standard in ruling on their motions for posttermination visitation.

We begin our analysis with the relevant standard of review and legal principles. The petitioner challenges the Appellate Court's application of the legal standard for deciding motions for posttermination visitation, and, therefore, her claim raises an issue of law over which we exercise plenary review. See, e.g., *Fish* v. *Fish*, 285 Conn. 24, 37, 939 A.2d 1040 (2008) ("[t]he . . . determination of the proper legal standard in any given case is a question of law subject to our plenary review").

Our recent decision in *In re Ava W.* squarely governs our analysis in the present case. In *In re Ava W.*, we held, for the first time, that a trial court has the authority to consider a motion for posttermination visitation

In reversing the trial court's denial of the respondents' motions for posttermination visitation, the Appellate Court specifically took issue with the trial court's use of the "not required" language, as well as its explicit rejection of the "best interest of the child" standard. See *In re Annessa J.*, supra, 206 Conn. App. 602–603 (noting that "the [trial] court went on to explain that the best interest standard was 'not the standard under . . . § 46b-121 (b) (1)' *and* that posttermination visitation was 'not required for the child's well-being, welfare, protection, proper care or suitable support,' " and concluding that, "[o]n the basis of *these statements* by the court, we are persuaded that the court failed to consider the appropriate standard" (emphasis altered)).

In re Annessa J.

when the court considers termination of parental rights pursuant to § 17a-112 (j).[10] *In re Ava W.*, supra, 336 Conn. 548–49, 577. This authority, we explained, originates from the trial court's broad authority in juvenile matters, codified at § 46b-121 (b) (1), "to make and enforce such orders . . . necessary or appropriate to secure the welfare, protection, proper care and suitable support of a child," including orders impacting parental rights, such as termination and visitation. See *In re Ava W.*, supra, 572–76.

Having determined that trial courts possess such authority, we next considered the legal standard and potential factors for trial courts to consider when evaluating motions for posttermination visitation. See id., 588–90. Ultimately, we "derive[d] the standard for evaluating posttermination visitation from the authority granted to trial courts under § 46b-121 (b) (1)"; id., 588–89; and concluded that "the mo[st] prudent approach when evaluating whether posttermination visitation should be ordered is to adhere to the standard that the legislature expressly adopted [in § 46b-121 (b) (1)]— 'necessary or appropriate to secure the welfare, protection, proper care and suitable support of [the] child . . . .' " Id., 589, quoting General Statutes § 46b-121 (b) (1). In adopting the "necessary or appropriate" standard, we considered and explicitly rejected the respondent mother's argument that trial courts should employ the "best interest of the child" standard when ruling on motions for posttermination visitation. See *In re Ava W.*, supra, 336 Conn. 589. Specifically, we wrote: "Although the respondent . . . [mother] contends that any posttermination visitation should be evaluated on

_____

[10] In a case that was argued on the same day as the present case, this court was asked to address whether, posttermination, biological parents have "a legally cognizable interest to support a right to intervene in [a] juvenile case for the purpose of seeking visitation." *In re Riley B.*, 342 Conn. 333, 336, 269 A.3d 776 (2022).

the basis of the child's best interest, we conclude that
the mo[st] prudent approach . . . is to adhere to the
standard that the legislature expressly adopted [in
§ 46b-121 (b) (1)] . . . .'' Id. We went on to explain
that whether to order posttermination visitation is a
question of fact for the trial court, and trial courts
should consider various factors when evaluating
whether to order posttermination visitation. Id. These
factors may include, but are not limited to, "the child's
wishes, the birth parent's expressed interest, the fre-
quency and quality of visitation between the child and
birth parent prior to the termination of the parent's
parental rights, the strength of the emotional bond
between the child and the birth parent, any interference
with present custodial arrangements, and any impact
on the adoption prospects for the child." Id., 590.

Despite our rejection of the "best interest of the child"
standard and adoption of the "necessary or appro-
priate" standard in *In re Ava W.*, in the present case,
the Appellate Court held—and Valerie argues—that our
decision in *In re Ava W.* did *not* unequivocally reject
the "best interest of the child" standard. Instead, the
Appellate Court interpreted *In re Ava W.* to hold that,
"when [a trial court rules on] a motion for posttermina-
tion visitation . . . the . . . court's consideration of
the traditional best interest of the child is only part of
the consideration of whether such visitation is 'neces-
sary or appropriate to secure the welfare, protection,
proper care and suitable support of [the] child.' " *In re
Annessa J.*, supra, 206 Conn. App. 601, quoting *In re
Ava W.*, supra, 336 Conn. 589. To support its reasoning,
the Appellate Court noted that, in *In re Ava W.*, before
setting forth factors that trial courts can consider in
ruling on a motion for posttermination visitation, we
stated: "Whether to order posttermination visitation is
. . . a question of fact for the trial court, which has
the parties before it and is in the best position to analyze

In re Annessa J.

all of the factors which go into the ultimate conclusion that [posttermination visitation is *in the best interest of the child*].'' (Emphasis added; internal quotation marks omitted.) *In re Ava W.*, supra, 589; see *In re Annessa J.*, supra, 601. The Appellate Court maintained that our use of the phrase ''best interest of the child'' in that portion of the decision indicates that a trial court ''should take a broader view of best interest [than the analysis made during the dispositional phase of the termination of parental rights hearing], including consideration of the factors set forth in *In re Ava W.*, to determine whether posttermination visitation is 'necessary or appropriate to secure the welfare, protection, proper care and suitable support of [the] child.' '' *In re Annessa J.*, supra, 602, quoting *In re Ava W.*, supra, 589.

We did not, however, intend this sentence, in isolation, to broaden the applicable standard to include a ''best interest of the child'' analysis. See, e.g., *Fisher* v. *Big Y Foods, Inc.*, 298 Conn. 414, 424–25, 3 A.3d 919 (2010) (''an opinion must be read as a whole, without particular portions read in isolation, to discern the parameters of its holding'').[11] Rather, read in its entirety, our decision in *In re Ava W.* held that trial courts must adhere to the ''necessary or appropriate'' standard set forth in § 46b-121 (b) (1), not the ''best interest of the child'' standard, when ruling on motions for posttermination visitation. See *In re Ava W.*, supra, 336 Conn. 589.[12]

---

[11] We acknowledge that, given our inclusion of the words ''the best interest of the child'' in *In re Ava W.*, the Appellate Court's interpretation was not without a logical basis. Any confusion that emanated from our unfortunate, but isolated, use of that phrase in *In re Ava W.* is hopefully cleared up by our legal analysis in this case.

[12] We pause briefly to provide one point of clarification. When a trial court analyzes the relevant factors to determine whether posttermination visitation is ''necessary or appropriate'' for the child's welfare, it makes its determination pursuant to its authority, codified at § 46b-121 (b) (1), to act in the child's best interest. See, e.g., *In re Ava W.*, supra, 336 Conn. 570–72 (citing historical cases demonstrating that, at common law, ''courts had *broad authority* to act in the child's best interest in juvenile matters,'' and

In re Annessa J.

Valerie nevertheless argues that the standard set forth in § 46b-121 (b) (1) necessarily incorporates the "best interest of the child" standard because it "codifies the . . . Superior Court's common-law powers to [issue] any order necessary or appropriate to secure the 'welfare' of a minor child committed to the court's jurisdiction." Valerie contends that, because the legislature enacted § 46b-121 (b) (1) "against the backdrop of . . . common-law history equating the child's welfare with the child's best interests," this court must presume that the legislature intended to incorporate the "best interest of the child" standard into § 46b-121 (b) (1) by its use of the word "welfare" in that statute. We disagree.

The legislature has frequently used the terms "best interest of the child," "best interests of the child," and "child's best interests" throughout chapter 815t of the General Statutes. See, e.g., General Statutes §§ 46b-129, 46b-129a, 46b-129c, 46b-132a and 46b-149. Typically, "[w]hen a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject . . . is significant to show that a different intention existed. . . . That tenet of statutory construction is well grounded because [t]he General Assembly is always presumed to know all the existing statutes and the effect that its action or [nonaction] will have [on] any one of them." (Internal quotation marks omitted.) *State* v. *Heredia*, 310 Conn. 742, 761, 81 A.3d 1163 (2013); see, e.g., *Felician Sisters of St. Francis of Connecticut, Inc.* v. *Historic District Commission*, 284 Conn. 838, 850,

§ 46b-121 (b) (1) codified that authority (emphasis added)). Our recognition that trial courts retain this broad authority does not indicate that courts should utilize a broad *standard* when ruling on motions for posttermination visitation. Indeed, the trial court's *authority* to issue orders for posttermination visitation is distinct from the *standard* that it applies in exercising that authority. As we explain in greater detail in this opinion, the standard we chose to adopt in *In re Ava W.* is that which the legislature expressly adopted in § 46b-121 (b) (1).

In re Annessa J.

937 A.2d 39 (2008) ("[t]he use of the different terms . . . within the same statute suggests that the legislature acted with complete awareness of their different meanings . . . and that it intended the terms to have different meanings" (internal quotation marks omitted)). Thus, we presume that, had the legislature intended to incorporate the "best interest of the child" standard into the "necessary or appropriate" standard set forth in § 46b-121 (b) (1), it would have used the words "best interest of the child" instead of, or in addition to, "welfare." See, e.g., *State* v. *Kevalis*, 313 Conn. 590, 604, 99 A.3d 196 (2014) ("it is a well settled principle of statutory construction that the legislature knows how to convey its intent expressly" (internal quotation marks omitted)); *McCoy* v. *Commissioner of Public Safety*, 300 Conn. 144, 155, 12 A.3d 948 (2011) ("[o]ur case law is clear . . . that when the legislature chooses to act, it is presumed to know how to draft legislation consistent with its intent and to know of all other existing statutes and the effect that its action or nonaction will have [on] any one of them" (internal quotation marks omitted)). We decline to import a standard into § 46b-121 (b) (1) that the legislature chose not to employ.

Anthony concedes that the Appellate Court "may have erred when it stated that this court [in *In re Ava W.*] did not explicitly reject the best interest standard" but nevertheless argues that the distinction that we drew in *In re Ava W.* between "necessary or appropriate" and "best interest of the child" was not substantive. To the extent that Anthony contends that whether a trial court utilizes the "best interest of the child standard" or the "necessary or appropriate" standard is purely a matter of semantics, we disagree. This contention is belied by our decision in *In re Ava W.*, in which, after considering both standards, we explicitly rejected the "best interest of the child" standard in favor of the "necessary or appropriate" standard. (Internal

In re Annessa J.

quotation marks omitted.) *In re Ava W.*, supra, 336 Conn. 588–89. Moreover, our legislature has used the "best interest of the child" standard in other related statutes, and, thus, we presume that it intended to use a different standard when it employed the "necessary or appropriate" standard in § 46b-121 (b) (1). Cf. *Lopa* v. *Brinker International, Inc.*, 296 Conn. 426, 433, 994 A.2d 1265 (2010) ("[T]he legislature [does] not intend to enact meaningless provisions. . . . [I]n construing statutes, we presume that there is a purpose behind every sentence, clause, or phrase used in an act and that no part of a statute is superfluous. . . . Because [e]very word and phrase [of a statute] is presumed to have meaning . . . [a statute] must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant." (Internal quotation marks omitted.)).

Moreover, we conclude that the "necessary or appropriate" standard is more stringent than the "best interest of the child" standard. Cf. *In re Alissa N.*, 56 Conn. App. 203, 208, 742 A.2d 415 (1999) ("Conducting a best interest analysis *is not a narrow concept* restricted to a compelling reason [for keeping a parent in a child's life] or to fully reuniting the parent with the child. Rather, it is *purposefully broad* to enable the trial court to exercise its discretion based [on] a host of considerations." (Emphasis added; internal quotation marks omitted.)), cert. denied, 252 Conn. 932, 746 A.2d 791 (2000). The term "necessary," when used in this context, has one fixed meaning: "Impossible to be otherwise . . . indispensable; requisite; [or] essential." Webster's New International Dictionary (1931) p. 1443. Although the definition of "appropriate" is elastic insofar as it is susceptible to a number of meanings; see, e.g., id., p. 111 (defining "appropriate" as "[b]elonging peculiarly," "suitable," "fit," or "proper"); given the fact that the preceding word in the standard is "necessary," we

choose to adopt a definition of "appropriate" that aligns with the more exacting term, "necessary." In the context of posttermination visitation, we read the word "appropriate" to mean "proper."

To define "appropriate" broadly would be to negate the word "necessary" within the standard set forth in § 46b-121 (b) (1). It is well settled that "[i]nterpreting a statute to render some of its language superfluous violates cardinal principles of statutory interpretation." *American Promotional Events, Inc.* v. *Blumenthal*, 285 Conn. 192, 203, 937 A.2d 1184 (2008). Furthermore, as Justice Keller notes in her concurrence, "there should be few cases in which court-ordered posttermination visitation could be deemed 'necessary or appropriate to secure the [child's] welfare,' " particularly in light of the grounds on which a trial court can terminate parental rights. See General Statutes § 17a-112 (j). A more exacting standard is required in this context, particularly in light of the rare circumstance in which a trial court could simultaneously terminate parental rights and, in the same proceeding, order posttermination visitation. Mindful of these considerations, we conclude that the "necessary or appropriate" standard is purposefully more stringent than the "best interest of the child" standard, as the trial court must find that posttermination visitation is necessary or appropriate—meaning "proper"—to secure the child's welfare.

Accordingly, we conclude that the Appellate Court improperly expanded the standard set forth in *In re Ava W.* As we held in *In re Ava W.*, the proper standard for deciding motions for posttermination visitation is the "necessary or appropriate" standard adopted by the legislature in § 46b-121 (b) (1). See *In re Ava W.*, supra, 336 Conn. 588–89.

Having concluded that the Appellate Court improperly expanded the standard for deciding motions for

posttermination visitation set forth in *In re Ava W.*,
we next must determine whether the Appellate Court
nevertheless correctly concluded that the trial court
held the respondents to a more stringent standard than
the "necessary or appropriate" standard that we articu-
lated in *In re Ava W.*

In its memorandum of decision, the trial court found
that "neither [Valerie] nor [Anthony] . . . met their
burden [of] prov[ing] [that] posttermination visitation
for such parent is *necessary or appropriate* to secure
the welfare, protection, proper care and suitable sup-
port of [Annessa]." (Emphasis added.) In so ruling, the
trial court recited the proper "necessary or appropriate"
standard. (Internal quotation marks omitted.) *In re Ava
W.*, supra, 336 Conn. 589. It also correctly recognized
that the respondents' contention—that it would be in
Annessa's best interest for posttermination visitation
to continue—was "not the standard under . . . § 46b-
121 (b) (1)." In addition, the trial court also explicitly
considered at least one of the factors we enumerated
in *In re Ava W.* that a trial court may consider when
determining whether posttermination visitation is "nec-
essary or appropriate" for the child's well-being. Specifi-
cally, in denying Anthony's motion for posttermination
visitation, the trial court noted that "[Anthony] and
Annessa do have a good visiting relationship." See *In
re Ava W.*, supra, 590 (noting that one factor trial courts
may consider when ruling on party's motion for postter-
mination visitation is "the frequency and quality of visi-
tation between the child and birth parent prior to the
termination of the parent's parental rights").

When the trial court's memorandum of decision is
read as a whole, the court's specific references to the
standard set forth in *In re Ava W.*, made throughout
the relevant portion of the court's memorandum, and
its explicit consideration of at least one factor from *In
re Ava W.*, indicate that the trial court applied the cor-

rect legal standard in ruling on the respondents' motions
for posttermination visitation. See, e.g., *In re Jason R.*,
306 Conn. 438, 453, 51 A.3d 334 (2012) ("[A]n opinion
must be read as a whole, without particular portions
read in isolation, to discern the parameters of its hold-
ing. . . . Furthermore, [w]e read an ambiguous trial
court record so as to support, rather than contradict, its
judgment." (Citation omitted; internal quotation marks
omitted.)). Indeed, in the absence of some clear indica-
tion to the contrary, we presume that the trial court
applied the correct legal standard. See, e.g., *DiBella* v.
*Widlitz*, 207 Conn. 194, 203–204, 541 A.2d 91 (1988)
("[in the absence of] a record that demonstrates that
the trial court's reasoning was in error, we presume
that the trial court correctly analyzed the law and the
facts in rendering its judgment"); *State* v. *Baker*, 50
Conn. App. 268, 275 n.5, 718 A.2d 450 ("the trial court's
ruling is entitled to the reasonable presumption that it
is correct unless the party challenging the ruling has
satisfied its burden [of] demonstrating the contrary"
(internal quotation marks omitted)), cert. denied, 247
Conn. 937, 722 A.2d 1216 (1998).

The respondents argue that the trial court's statement
that posttermination visitation with the respondents
was "not required" for Annessa's well-being demon-
strates that the trial court was holding them to a more
stringent standard than is required by *In re Ava W.*
We disagree.

We conclude that the trial court's finding that postter-
mination visitation with the respondents was "not
required" merely reiterated its earlier conclusion that
such visitation was not "necessary," part and parcel of
the standard set forth in *In re Ava W.*, which requires
trial courts to consider whether posttermination visita-
tion is "*necessary* or appropriate" for the child's well-
being. (Emphasis added; internal quotation marks omit-
ted.) *In re Ava W.*, supra, 336 Conn. 589. Indeed, the

In re Annessa J.

terms "necessary" and "required" are synonymous. See, e.g., Merriam-Webster's Collegiate Dictionary (11th Ed. 2014) p. 828 (defining "necessary" as "absolutely needed" and identifying "*required*" as synonymous term (emphasis added)). As we have previously noted, "this court has never required the talismanic recital of specific words or phrases if a review of the entire record supports the conclusion that the trial court properly applied the law." *State* v. *Henderson*, 312 Conn. 585, 597, 94 A.3d 614 (2014); see, e.g., *State* v. *Reid*, 22 Conn. App. 321, 326–27, 577 A.2d 1073 (determining that trial court's charge to jury was not defective, despite fact that court substituted word "adverse" for "unfavorable" in statute, "because the terms are synonymous and such a substitution does not change the meaning of the sentence"), cert. denied, 216 Conn. 828, 582 A.2d 207 (1990).

Given that the trial court correctly articulated the "necessary *or* appropriate" standard; (emphasis added; internal quotation marks omitted) *In re Ava W.*, supra, 336 Conn. 589; see *State* v. *Dennis*, 150 Conn. 245, 248, 188 A.2d 65 (1963) ("[t]he use of the disjunctive 'or' between the two parts of the statute indicates a clear legislative intent of separability"); and stated that post-termination visitation was "not required" only *after* it determined that the respondents had not satisfied their burden of proving that such visitation was "necessary or appropriate" to secure Annessa's welfare, we are persuaded that the trial court understood that it was required to determine whether posttermination visitation was either necessary (i.e., required) *or* appropriate. Cf. *Hartford* v. *CBV Parking Hartford, LLC*, 330 Conn. 200, 214–15, 192 A.3d 406 (2018) (rejecting city's argument that trial court failed to consider critical element when reaching its decision because trial court did not recite relevant "talismanic phrase," and concluding that trial court applied proper legal standard because it repeatedly cited to decision of this court, which unam-

In re Annessa J.

biguously set forth legal standard, and implicitly acknowledged that element in its analysis). We therefore conclude that the Appellate Court incorrectly determined that the trial court held the respondents to a more exacting legal standard than the one set forth in *In re Ava W.*

The judgment of the Appellate Court is reversed insofar as that court reversed the trial court's rulings on the respondents' motions for posttermination visitation, the judgment of the Appellate Court is affirmed insofar as that court upheld the trial court's termination of the respondents' parental rights, and the case is remanded to the Appellate Court with direction to affirm the judgment terminating the respondents' parental rights and to affirm the trial court's denial of the respondents' motions.

In this opinion ROBINSON, C. J., and D'AURIA and MULLINS, Js., concurred.

ECKER, J., concurring. I join part I of the majority opinion, in which the majority rejects the unpreserved constitutional challenge of the respondent mother to the remote trial procedure used to adjudicate the petition to terminate her parental rights. I disagree, however, with part II of the majority opinion regarding the legal standard applicable to a motion for posttermination visitation. In my view, the scope of a trial court's authority under General Statutes § 46b-121 (b) (1) "to make and enforce . . . orders" that "the court deems necessary or appropriate to secure the welfare, protection, proper care and suitable support of a child" simply does not provide a workable legal standard to guide a trial court's decision making on the subject of posttermination visitation, and the majority's revision of that language to effectively delete the words "or appropriate" is not a viable option. I agree with part II of

In re Annessa J.

Justice Keller's concurring opinion that, in the absence of further legislative guidance, the proper legal standard under these circumstances should be the standard articulated in General Statutes § 46b-59, which was designed and intended to apply to ''[a]*ny* person'' who seeks visitation with a minor child. (Emphasis added.) General Statutes § 46b-59 (b). Because it is clear on the present record that the respondent parents cannot prevail under the standard articulated by the majority or § 46b-59, I agree with the majority that the judgment of the Appellate Court reversing the trial court's orders denying the respondents' motions for posttermination visitation should be reversed. I therefore concur with the result the majority reaches in part II of its opinion.

I agree with the majority that nothing in our opinion in *In re Ava W.*, 336 Conn. 545, 248 A.3d 675 (2020), should be understood to suggest that terminated parents can obtain visitation under a loose or liberal standard. See part II of the majority opinion. Our holding in that case, first and foremost, established the threshold point that the trial court was not powerless to order posttermination visitation if necessary or appropriate to secure the welfare of the child. See *In re Ava W.*, supra, 589. Of course, the fact that a court has the *authority* to decide an issue often does not tell the court *how* to exercise that authority in any particular case, and, as to that more particular issue, the majority is correct that *In re Ava W.* cannot be read to suggest that the usual ''best interest of the child'' standard by itself supplies the proper decisional matrix in the case of posttermination visitation.

But none of this means that the ''necessary or appropriate'' standard, without more, is sufficient to guide the exercise of the trial court's general authority to make and to enforce orders in this delicate context. There surely is no reason to believe that the legislature intended that broad and open-ended standard to supply

In re Annessa J.

the substantive rule of decision with respect to posttermination visitation, or, for that matter, any other ruling that is within the jurisdictional purview of a "juvenile matter," as defined by § 46b-121 (a). I recognize that we concluded in *In re Ava W.* that it was "more prudent" to derive the posttermination visitation standard from the "necessary or appropriate" formulation than to adopt the "best interest of the child" standard; id.; but it is abundantly clear now, if it was not then, that this standard, without more, does not provide sufficient legal guidance to trial courts adjudicating motions for posttermination visitation. Indeed, we implicitly acknowledged in *In re Ava W.* itself the need for additional adjudicative guidance when we observed that a trial judge would be required to devise and consider more particularized "factors" to determine whether posttermination visitation is necessary or appropriate. Id., 589–90. At the time, we left to the trial courts the task of formulating the more specific factors to guide their decision making, in the belief that they are "best equipped to determine the factors worthy of consideration in making this finding." Id. We also offered suggestions of our own and references for additional consultation along these lines.[1]

It therefore should come as no surprise that the broad "necessary or appropriate" standard now requires fur-

_____

[1] We stated: "As examples—which are neither exclusive nor all-inclusive—a trial court may want to consider the child's wishes, the birth parent's expressed interest, the frequency and quality of visitation between the child and birth parent prior to the termination of the parent's parental rights, the strength of the emotional bond between the child and the birth parent, any interference with present custodial arrangements, and any impact on the adoption prospects for the child. See *In re Adoption of Rico*, [453 Mass. 749, 754–55, 905 N.E.2d 552 (2009)] (court explained circumstances in which order for posttermination visitation may be appropriate and warranted); see also A. Williams, Note, 'Rethinking Social Severance: Post-Termination Contact Between Birth Parents and Children,' 41 Conn. L. Rev. 609, 636 (2008) (listing factors to consider for posttermination visitation). Trial courts should, of course, evaluate those considerations independently from the termination of parental rights considerations." *In re Ava W.*, supra, 336 Conn. 590.

In re Annessa J.

ther refinement in light of the uncertainty on the subject that apparently has arisen in the wake of *In re Ava W.* The majority refines the "necessary or appropriate" standard by construing it to mean something closely approximating "necessary or necessary." See part II of the majority opinion. I would prefer to say that (1) the breadth and malleability of the statutory formulation require additional judicial gloss in the absence of direct legislative guidance addressing the specific context of posttermination visitation, (2) the supplementation to the "necessary or appropriate" formulation that we offered in our initial attempt to address the issue in *In re Ava W.* now appears to provide insufficient guidance, and (3) the most sensible and defensible legal framework to determine what is necessary or appropriate in this particular context is the standard set forth in § 46b-59. In the absence of further legislative guidance, I agree with part II of Justice Keller's concurring opinion that § 46b-59 provides the best legal framework for trial courts to adjudicate motions for posttermination visitation.[2] Applying the substantive standards set forth in

---

[2] Under § 46b-59, "a third party seeking visitation over a fit parent's objection must surmount a high hurdle . . . and . . . establish, by clear and convincing evidence, that (1) a parent-like relationship exists, and (2) denial of visitation would cause the child to suffer real and significant harm." (Citation omitted; internal quotation marks omitted.) *Boisvert* v. *Gavis*, 332 Conn. 115, 133, 210 A.3d 1 (2019); see part II of Justice Keller's concurring opinion, citing *Roth* v. *Weston*, 259 Conn. 202, 234–35, 789 A.2d 431 (2002).

I agree with Justice Keller that, because the statutory parent's objection to visitation is not of constitutional dimension, the burden of proof should be reduced to a preponderance of the evidence. See part II of Justice Keller's concurring opinion. I do not join Justice Keller's suggestion that an order of posttermination visitation should automatically terminate upon adoption, although I understand and acknowledge the concerns prompting that suggestion. Section 46b-59 (f) itself makes it clear that an order of visitation *may* be terminated upon adoption of the minor child: "The grant of such visitation rights shall not prevent any court of competent jurisdiction from thereafter acting upon the custody of such child, the parental rights with respect to such child or the adoption of such child and any such court may include in its decree an order terminating such visitation rights." In my view, whether to terminate visitation is a decision that should be made by the trial court under the particular factual circumstances of each case. I would hope that,

In re Annessa J.

§ 46b-59 means that terminated parents seeking court-ordered visitation are subject to the same requirements as any other nonparents seeking such visitation. That standard is difficult but not impossible to meet, and it remains true, as we said in *In re Ava W.*, that trial courts are best able to decide whether the circumstances in any particular case warrant a carefully crafted order of visitation in accordance with the statutory terms. Because the respondent parents failed to establish that posttermination visitation was necessary or appropriate under the majority's construction of that term or § 46b-59, I concur in part II of the majority opinion.

KELLER, J., with whom KAHN, J., joins, concurring. I agree with and fully join in part I of the majority opinion, which determines that the Appellate Court correctly affirmed the trial court's judgment insofar as it terminated the parental rights of the respondents, Valerie H. and Anthony J., as to their minor child, Annessa J., by way of a virtual trial. I also agree with the result the majority reaches in part II of its opinion—that the Appellate Court improperly reversed the judgment of the trial court insofar as it denied the respondents' motions for posttermination visitation with Annessa on the ground that the trial court applied an incorrect legal standard rather than the standard required under *In re Ava W.*, 336 Conn. 545, 248 A.3d 675 (2020).

Although the petitioner, the Commissioner of Children and Families, has not requested reconsideration of *In re Ava W.*, I write separately to address that matter because I am convinced that the questions presented

if a trial court has determined that visitation with a terminated parent is warranted under the high standard prescribed by § 46b-59, a prospective adoptive parent would not allow the possibility of continued visitation to derail the adoption. I freely concede that my speculation on this point may be more aspirational in theory than justifiable in practice, but, at this juncture, it is unnecessary to decide the automatic termination question.

In re Annessa J.

in part II of the majority opinion are the manifestation of the first of many issues that will arise if this court does not reconsider the holding in *In re Ava W.* that General Statutes § 46b-121 (b) (1) provides the Superior Court with authority in juvenile matters to order posttermination visitation prior to the rendering of a final judgment terminating parental rights.[1] See id., 585, 590 n.18. I use this concurrence to explain how the court in *In re Ava W.* misinterpreted the common law and the statutory scheme and, more importantly, how its holding threatens to undermine the public policy that the statutory scheme is intended to advance. The court in *In re Ava W.* not only decreed the validity of posttermination visitation orders previously uncontemplated in our courts,[2] the logistics of effectuating this change in our jurisprudence could lead to potentially disruptive change and the attendant psychological and economic costs to children, foster parents, preadoptive and adoptive parents, the Department of Children and Families,

---

[1] Recently, in *In re Riley B.*, 342 Conn. 333, 269 A.3d 776 (2022), this court addressed an issue left open in *In re Ava W.*, concluding that a former parent who files a motion for posttermination visitation *subsequent* to the rendering of a judgment terminating parental rights lacks a colorable claim of a direct and substantial interest in the posttermination phase of the juvenile matter to warrant the former parent's intervention as a matter of right. Id., 353.

[2] Connecticut courts have uniformly concluded that a request for visitation prior to the termination of parental rights trial is rendered moot once parental rights have been terminated. See, e.g., *In re Candace H.*, 259 Conn. 523, 526, 790 A.2d 1164 (2002); *In re Amy H.*, 56 Conn. App. 55, 61, 724 A.2d 372 (1999); *In re Victor D.*, Docket No. CP-10-007160-A, 2014 WL 7461459, *57 (Conn. Super. November 7, 2014); *In re Daniel C.*, Docket Nos. N05-JV-98-0009922-S and N05-JV-98-0009923-S, 1999 WL 558102, *1 n.2 (Conn. Super. July 22, 1999), aff'd, 63 Conn. App. 339, 776 A.2d 487 (2001); *In re Luke G.*, 40 Conn. Supp. 316, 326, 498 A.2d 1054 (1985). As one trial court aptly explained, a posttermination visitation order would be inconsistent with the judgment terminating parental rights, the purpose of which is to vest legal authority to make decisions about the children's future life and contact with others with the statutory parent. *In re Felicia B.*, Docket Nos. H13-JV-97-0005534-S and H13-JV-97-0005535-S, 1998 WL 928410, *4 (Conn. Super. December 29, 1998), aff'd, 56 Conn. App. 525, 743 A.2d 1160, cert. denied, 252 Conn. 951, 748 A.2d 298 (2000).

In re Annessa J.

and the courts. As I am nonetheless mindful that *In re Ava W.* is currently controlling precedent, I also suggest two important clarifications that this court could make to minimize some of its potentially disruptive effects.

I

Section 46b-121 (b) (1) provides in relevant part: "In juvenile matters, the Superior Court shall have authority to make and enforce such orders directed to parents . . . guardians, custodians or other adult persons owing some legal duty to a child therein, as the court deems necessary or appropriate to secure the welfare, protection, proper care and suitable support of a child subject to the court's jurisdiction or otherwise committed to or in the custody of the Commissioner of Children and Families. . . .''

A

I begin with the legal underpinnings of the decision in *In re Ava W.* The court in *In re Ava W.* began its analysis with the premise that the authority to order posttermination visitation existed at common law. See *In re Ava W.*, supra, 336 Conn. 569. After surveying early English and Connecticut case law, the court concluded: "These cases suggest that, under our common law, courts had broad authority to act in the child's best interest in juvenile matters. More specifically, we are able to glean from historical cases that, as part of their common-law authority, our courts contemplated termination and limitation of parental rights (described at the time as custody and modification of custody).'' Id., 570–71.

The court then interpreted § 46b-121 (b) (1), and its predecessors dating back to 1921, as a codification of this broad common-law authority. Id., 549, 571–72. As proof of this fact, the court pointed to the statutory text authorizing the trial court to issue any order that

In re Annessa J.

it deems "necessary *or* appropriate" and the fact that the scope of the statute is extended to any "adult persons owing some legal duty to a child" rather than being limited to parents. (Emphasis in original; internal quotation marks omitted.) Id., 572. The court then observed: "Although § 46b-121 (b) (1) does not expressly mention orders for posttermination visitation, neither does it expressly preclude that authority. In our view, a broad statutory grant of authority and a lack of limiting language . . . supports [a] conclusion that the Superior Court has the authority to issue such an order." (Internal quotation marks omitted.) Id., 572–73.

The court in *In re Ava W.* thus reasoned that the legislature's failure to "abrogate" the trial court's common-law authority to regulate visitation requires this court to interpret § 46b-121 (b) (1) to encompass posttermination visitation. Id., 574. The court pointed to *Michaud* v. *Wawruck*, 209 Conn. 407, 551 A.2d 738 (1988), in which a posttermination visitation agreement between the former parent[3] and adoptive parents was deemed enforceable, as further evidence that the legislature had not "expressly abrogated the authority to make or enforce orders regarding posttermination visitation." *In re Ava W.*, supra, 336 Conn. 576.

Finally, the court in *In re Ava W.* considered whether the statutory provisions governing cooperative post-adoption visitation agreements between parents and prospective adoptive parents, enacted after *Michaud*; see General Statutes § 17a-112 (b) through (h); "abrogated a court's common-law authority to issue orders in juvenile matters and thus serves as a limitation on the court's authority to order posttermination visitation." *In re Ava W.*, supra, 336 Conn. 579. The court

[3] I use the term "former parent" rather than "biological parent," the term employed in most of the case law on this subject, because biological parent does not include adoptive parents.

pointed out that the operation of § 17a-112 (b), which applies to proceedings to terminate parental rights, is limited in scope and does not apply to contested posttermination visitation orders. Id., 580. Because the court viewed the provisions governing the cooperative agreements to control a narrower subset of circumstances than those under § 46b-121 (b) (1), it determined that the rule of construction under which a more specific statute relating to a particular subject matter will control over a more general statute that might apply was not controlling. Id., 582. The court also pointed to statutory text providing that "[cooperative postadoption agreements] shall be in addition to those under common law" as evidence that the legislature did not intend to abrogate the common law. (Internal quotation marks omitted.) Id., 580, quoting General Statutes § 17a-112 (b).

B

The cases cited by the court in *In re Ava W.* support the proposition that courts historically exercised common-law authority to ensure care for neglected or abused children and to remove a child from unfit parents' custody. Id., 569–71. The court in *In re Ava W.* did not, however, cite a single case in which the court exercised common-law authority to order that parental visitation be provided with a child removed from the parent's custody.

An authoritative treatise that addresses the origins and limits of the court's equitable jurisdiction explains that this jurisdiction "extends to the care of the person of the [child], so far as is necessary for his protection and education; and to the care of the property of the [child] for its due management, and preservation, and proper application for his maintenance." 2 J. Story, Commentaries on Equity Jurisprudence, as Administered in England and America (2d Ed. 1839) § 1341, p.

573; see also id., § 1333 p. 561 (acknowledging that long-standing equitable jurisdiction over persons and property of children flows from crown's ''general power and duty, as parens patriae, to protect those, who have no other lawful protector''). When the father is unfit to protect and provide education for his child,[4] the court will ''deprive him of the custody of his children, and appoint a suitable person to act as guardian, and to take care of them, and to superintend their education.'' Id., § 1341 p. 575. Although the treatise indicates that the court had jurisdiction to direct the guardian to take actions necessary to the child's maintenance, care, or education (typically for the benefit of children who come from families with means); see id., § 1337 p. 570; id., § 1338 pp. 570–71; id., § 1349 p. 579; id., § 1351 p. 580; id., § 1354 p. 582; the subject of visitation is never mentioned.

This omission is not surprising. Although the father's custody could be restored by way of a habeas petition upon proof of fitness; *Kelsey* v. *Green*, 69 Conn. 291, 298, 301, 37 A. 679 (1897); neither the state nor the court had any obligation to aid family reunification. It was not until 1923 that the United States Supreme Court held that parents have a constitutionally protected interest in the care and control of their children; see *Meyer* v. *Nebraska*, 262 U.S. 390, 399, 401, 43 S. Ct. 625, 67 L. Ed. 1042 (1923); and not until 1972 that such rights were recognized in the context of custody and visitation decisions; see *Stanley* v. *Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972); long after our

---

[4] At common law, the right to custody and control of minor children inhered exclusively in the father; the mother could become the child's natural guardian only upon the father's death. See *Goshkarian's Appeal*, 110 Conn. 463, 466, 148 A. 379 (1930). The earliest statutes similarly contemplated appointment of a guardian for a child only when the father was incapable of caring for the child. See General Statutes (1854 Rev.) tit. VII, c. 6, § 35. It was only by statute, first enacted in 1901, that the rights of both parents were made equal. See *Goshkarian's Appeal*, supra, 466.

In re Annessa J.

legislature adopted a statutory scheme to address the care and custody of neglected, uncared for, and abused children.[5] See General Statutes (1854 Rev.) tit. VII, c. 6, § 35.

Another essential fact that must be considered is that the concept of termination of parental rights, as it is understood today, was unknown to the common law. See *Woodward's Appeal*, 81 Conn. 152, 166, 70 A. 453 (1908) ("A . . . parent has certain legal rights in respect to his children during minority. But these rights are not absolute rights, they may be forfeited by his own conduct, they may be modified or suspended against his will by action of the court, they may to a certain extent be transferred by agreement to another, but *they cannot be destroyed as between himself and his child, except by force of statute*." (Emphasis added.)). The child's care and custody could be vested in a guardian, but guardianship did not terminate the father's obligation to provide for the child's support; see *Stanton* v. *Willson*, 3 Day (Conn.) 37, 57–58 (1808); see also *Penfield* v. *Savage*, 2 Conn. 386, 387 (1818) ("a guardian is not bound to support his ward out of his own estate"); nor did it preclude restoration of the parents' custody. Similarly, adoption of children removed from their parents' custody was not recognized under the common law. See *Woodward's Appeal*, supra, 164–65 (construing Wisconsin statute similar to Connecticut's adoption

---

[5] See *Doe* v. *Doe*, 163 Conn. 340, 344, 307 A.2d 166 (1972) (noting that, when trial court rendered its decision, it did not have benefit of United States Supreme Court's decision in *Stanley* v. *Illinois*, supra, 405 U.S. 645, which held that both due process and equal protection clauses of fourteenth amendment to United States constitution required hearing on parent's fitness before his children could be taken from him); see also *In re Juvenile Appeal (Anonymous)*, 181 Conn. 638, 648, 436 A.2d 290 (1980) (*Parskey, J.*, dissenting) (citing *Stanley* for proposition that "[this court] must examine the 'no ongoing parent-child relationship' ground for termination in light of the [respondent's] constitutional right to preserve her parental rights in the absence of a powerful countervailing state interest").

In re Annessa J.

statute and explaining that "courts in applying statutes of this kind have held that the power to so adopt minor children is a creation of the statute *unknown to the common law* . . . and that an adoption is invalid unless made in pursuance of the essential requirements of the statute" (emphasis added)); see also *Goshkarian's Appeal*, 110 Conn. 463, 473–77, 148 A. 379 (1930) (*Wheeler, C. J.*, dissenting) (discussing history of Connecticut adoption law from 1864 to 1930). Given the absence of any common-law procedure to terminate parents' rights vis-à-vis their children or to effectuate adoptions, statutes purportedly codifying the court's common-law authority could not have included (or contemplated) authority to grant posttermination visitation.

There can be no doubt that the statutory scheme governing neglected and abused children expanded on the court's common-law authority. In our earliest statutes, parents were designated as their children's "guardians" and could be removed as such by the Probate Court if the children had been abandoned or neglected, or the parent was otherwise unfit. See General Statutes (1866 Rev.) tit. XIII, c. 5, § 68; General Statutes (1854 Rev.) tit. VII, c. 6, § 35. The newly appointed guardian was granted "control of the person of such minor, and the charge and management of his estate; and a guardian so appointed shall have the same power over the person and property of such minor, as guardians of minors whose parents are deceased." General Statutes (1866 Rev.) tit. XIII, c. 5, § 68. The Probate Court was given authority to approve an adoption agreement between the child's newly designated guardian and a third party. See General Statutes (1875 Rev.) tit. XIV, c. 4, §§ 1 and 2. Approval of the adoption agreement rendered the adoptive parents the legal parent of the child with all of the rights and duties of a "legitimate" parent. General Statutes (1875 Rev.) tit. XIV, c. 4, § 2. It is thus fair to infer that adoption extinguished all

In re Annessa J.

legal rights and obligations of the child's parents with respect to their child.[6] There is neither a textual basis nor case law from which an inference can be drawn, however, that the Probate Court had authority, in connection with its approval of the adoption agreement, to order the adoptive parents to provide visitation with the child's former parents.

In 1921, the legislature created the juvenile courts and provided such courts with the broad grant of authority to issue orders to parents and persons owing a legal duty to the child that are necessary or appropriate to secure the support or welfare of the child— the predecessor to § 46b-121 (b) (1).[7] See Public Acts 1921, c. 336, § 3. *A procedure to terminate parental rights prior to adoption still did not exist.* This statutory grant of authority could not, therefore, have been intended to include orders for posttermination visitation.

A procedure to terminate parental rights, prior to adoption, was not enacted until almost *four decades* later. See Public Acts 1959, No. 184. The legislative history reveals that the purpose of this procedure was to end the disruptive practice of parents filing petitions to revoke their child's commitment to the commissioner's predecessor after a required trial period for an adoptive placement began. See Conn. Joint Standing Committee Hearings, Public Welfare and Humane Insti-

---

[6] Courts held that, "[w]hen the custody of a child has been taken from [child's] parents because [he or she] is neglected and uncared for, their consent to its adoption is not required, since they have already been fully divested of its custody and control." *Goshkarian's Appeal*, supra, 110 Conn. 469.

[7] "[I]n 1978, the [legislature] enacted General Statutes § 51-164s, which merged the Juvenile Court with the Superior Court . . . [and] vested in the Superior Court the jurisdiction that had until then resided in the Juvenile Court. . . . [A]ll juvenile matters now come under the administrative umbrella of the family division of the Superior Court." (Citations omitted; internal quotation marks omitted.) *In re Ava W.*, supra, 336 Conn. 571 n.12.

343 Conn. 642 JUNE, 2022 691

In re Annessa J.

tutions, 1959 Sess., pp. 34–36, remarks of Assistant Attorney General Ernest Halstead on behalf of the Commissioner of Welfare. Not long thereafter, the legislature defined "termination of parental rights" to make clear that it means "the *complete severance* by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent . . . ." (Emphasis added.) Public Acts 1965, No. 488, § 1; see Public Acts 1974, No. 74-164, § 1 (expanding on that definition by adding "so that the child is free for adoption"); see also General Statues § 17a-93 (5) (current codification of definition). Relying on a similarly worded statute, the Maine Supreme Judicial Court reasoned: "The plain language of this section mandates that a termination order sever the relationship between parent and child. The court's attempt to terminate the mother's rights to her children and concomitantly to preserve her relationship with them by requiring the [relevant state agency] to provide for continuing visitation was beyond its authority." *In re Melanie S.*, 712 A.2d 1036, 1037–38 (Me. 1998).

Thus, it was made plain and unambiguous as of 1965 that the trial court had no authority under § 46b-121 (b) (1) to direct orders to former parents whose parental rights had been terminated. Severance of their responsibilities to the child meant that they were no longer "adult persons owing some legal duty to a child . . . ." General Statutes § 46b-121 (b) (1). The court's reliance in *In re Ava W.* on this language as support for a court's authority to issue posttermination orders for the benefit of the former parent is therefore misplaced.[8]

[8] To avoid the problem posed by the definition of termination of parental rights, the court in *In re Ava W.* characterizes posttermination visitation as an exercise of the court's equitable authority under § 46b-121 (b) (1) and not a *right* afforded to the parent. See *In re Ava W.*, supra, 336 Conn. 560–61. But the result is a distinction without a difference when *In re Ava W.* affords the parent the right to move for posttermination visitation and the decision to grant such visitation is assessed under a standard as elastic as "necessary or appropriate . . . ." General Statutes § 46b-121 (b) (1).

In re Annessa J.

Subsequent changes to the statutory scheme with regard to termination of parental rights provide further evidence that the grant of authority in § 46b-121 (b) (1) was not intended to authorize the trial court to issue posttermination visitation orders. The legislature also provided authority to the Probate Court to adjudicate certain petitions for termination of parental rights. See General Statutes § 45a-715. It did not provide the Probate Court with authority similar to that under § 46b-121 (b) (1). Consequently, under the interpretation of the scheme by the court in *In re Ava W.*, the availability of posttermination visitation would depend on the forum in which the petition for termination of parental rights was adjudicated.[9] A construction of § 46b-121 (b) (1) under which it does not include authority to order posttermination visitation would render the termination scheme in harmony. See, e.g., *In re Jusstice W.*, 308 Conn. 652, 663, 65 A.3d 487 (2012) ("the legislature is always presumed to have created a harmonious and consistent body of law" (internal quotation marks omitted)).

Yet another significant change was the addition of authority for the trial court to appoint a "statutory parent" for the child following termination of parental rights, typically the commissioner. See General Statutes §§ 17a-93 (6), 17a-112 (m), 45a-717 (f) and (g), 45a-718 and 46b-129b (a). This appointment allowed the statutory parent to assume the role previously played by the legal parent and thereby served as a further backstop against the former parent's efforts to impede adoption. See General Statutes § 45a-718 (b) ("[t]he statutory parent shall be the guardian of the person of the

---

[9] The respondent parent could move to transfer the termination petition from the Probate Court to the Superior Court, but such a request must be made prior to a hearing on the merits; see General Statutes § 45a-715 (g); and hence prior to the time that the issue of posttermination visitation is likely to be contemplated in a contested case.

child, shall be responsible for the welfare of the child
and the protection of the child's interests and shall
retain custody of the child until the child attains the
age of eighteen unless, before that time, the child is
legally adopted or committed to the [c]ommissioner
. . . or a licensed child-placing agency''); see also 16
S. Proc., Pt. 3, 1973 Sess., p. 1434, remarks of Senator
George C. Guidera (describing steps in adoption pro-
cess as termination of parental rights, appointment of
a statutory parent, and then adoption proceedings, and
explaining that ''[t]he concept of a statutory parent is
new in the law and is necessary in order to effectuate a
greater degree of finality in adoptions''). The legislature
thereby expressed its clear intention that the statutory
parent would have control over the decision whether
posttermination visitation, or any other form of contact
with the former parent, was in the child's best interest.
See *In re Nayya M.*, Docket No. H12-CP-10-012977-
A, 2012 WL 2855816, *31 (Conn. Super. June 7, 2012)
(ordering that ''[a]ny future contact between the chil-
dren and any of the respondent parents shall be left to
the [commissioner's] or subsequent adoptive parents'
informed discretion''); *In re Andrew C.*, Docket No.
H12-CP-11-013647-A, 2011 WL 1886493, *15 (Conn.
Super. April 19, 2011) (listing nine trial court decisions
holding that judgment terminating parental rights
allows legal authority over children to be vested in
statutory parent or adoptive parents regarding deci-
sions about children's future life and their contact with
others); see also *Division of Youth & Family Services*
v. *B.G.S.*, 291 N.J. Super. 582, 594–96, 677 A.2d 1170
(App. Div. 1996) (authority to allow posttermination
visitation rests exclusively with state child protection
agency).

The clearest indication that the court misinterpreted
§ 46b-121 (b) (1) in *In re Ava W.*, however, may be the
plain and unambiguous evidence that the legislature

In re Annessa J.

considered posttermination visitation for a parent whose rights have been terminated and provided the trial court with authority to grant it in only one circumstance: cooperative postadoption agreements.[10] See General Statutes § 17a-112 (b) through (h); see also General Statutes § 45a-715 (h) through (s) (granting similar authority to Probate Court). As important as the fact that the legislature provided such authority is the extent to which it prescribed substantive and procedural criteria to guide and limit the exercise of that authority.[11] The

[10] The legislature also considered and provided for posttermination visitation for siblings. Siblings of children committed to the department have the right to file a motion and to be heard on the issue of visitation. See General Statutes §§ 17a-15 (d) and 46b-129 (q); see also General Statutes § 45a-715 (o) (allowing court to consider and order postadoption communication or contact with sibling). No similar right is expressly provided for the former parent.

[11] General Statutes § 17a-112 provides in relevant part: "(b) Either or both birth parents and an intended adoptive parent may enter into a cooperative postadoption agreement regarding communication or contact between either or both birth parents and the adopted child. Such an agreement may be entered into if: (1) The child is in the custody of the Department of Children and Families; (2) an order terminating parental rights has not yet been entered; and (3) either or both birth parents agree to a voluntary termination of parental rights, including an agreement in a case which began as an involuntary termination of parental rights. The postadoption agreement shall be applicable only to a birth parent who is a party to the agreement. Such agreement shall be in addition to those under common law. Counsel for the child and any guardian ad litem for the child may be heard on the proposed cooperative postadoption agreement. There shall be no presumption of communication or contact between the birth parents and an intended adoptive parent in the absence of a cooperative postadoption agreement.

"(c) If the Superior Court determines that the child's best interests will be served by postadoption communication or contact with either or both birth parents, the court shall so order, stating the nature and frequency of the communication or contact. A court may grant postadoption communication or contact privileges if: (1) Each intended adoptive parent consents to the granting of communication or contact privileges; (2) the intended adoptive parent and either or both birth parents execute a cooperative agreement and file the agreement with the court; (3) consent to postadoption communication or contact is obtained from the child, if the child is at least twelve years of age; and (4) the cooperative postadoption agreement is approved by the court.

"(d) A cooperative postadoption agreement shall contain the following:

In re Annessa J.

legislature prescribed the circumstances under which such agreements would be subject to approval (e.g., parent agrees to voluntary termination of parental rights) and the necessary terms of such agreements (e.g., parent's acknowledgment that adoption is irrevocable, even if adoptive parents violate agreement). See General Statutes § 17a-112 (b) through (e). It protected the adoptive parents' right to change their residence after executing the agreement. See General Statutes

(1) An acknowledgment by either or both birth parents that the termination of parental rights and the adoption is irrevocable, even if the adoptive parents do not abide by the cooperative postadoption agreement; and (2) an acknowledgment by the adoptive parents that the agreement grants either or both birth parents the right to seek to enforce the cooperative postadoption agreement.

"(e) The terms of a cooperative postadoption agreement may include the following: (1) Provision for communication between the child and either or both birth parents; (2) provision for future contact between either or both birth parents and the child or an adoptive parent; and (3) maintenance of medical history of either or both birth parents who are parties to the agreement.

"(f) The order approving a cooperative postadoption agreement shall be made part of the final order terminating parental rights. The finality of the termination of parental rights and of the adoption shall not be affected by implementation of the provisions of the postadoption agreement. Such an agreement shall not affect the ability of the adoptive parents and the child to change their residence within or outside this state.

"(g) A disagreement between the parties or litigation brought to enforce or modify the agreement shall not affect the validity of the termination of parental rights or the adoption and shall not serve as a basis for orders affecting the custody of the child. The court shall not act on a petition to change or enforce the agreement unless the petitioner had participated, or attempted to participate, in good faith in mediation or other appropriate dispute resolution proceedings to resolve the dispute and allocate any cost for such mediation or dispute resolution proceedings.

"(h) An adoptive parent, guardian ad litem for the child or the court, on its own motion, may, at any time, petition for review of any order entered pursuant to subsection (c) of this section, if the petitioner alleges that such action would be in the best interests of the child. The court may modify or terminate such orders as the court deems to be in the best interest of the adopted child. . . ."

The provisions in the Probate Court scheme for cooperative postadoption agreements mirror the provisions in § 17a-112. See General Statutes § 45a-715 (h) through (n).

§ 17a-112 (f). The legislature not only provided proce-
dures for the approval of the agreement and its incorpo-
ration into the final order terminating parental rights,
but also anticipated and provided guidance regarding
disagreements between the parties and changed cir-
cumstances. See General Statutes § 17a-112 (c), (f), (g)
and (h). Surely, if the legislature enacted provisions
protecting intended adoptive parents who willingly
enter into a postadoption agreement, it would have
afforded adoptive parents equivalent protections when
there is no such cooperation if it actually thought that
the law already permitted or should be amended to
permit the unilateral imposition of posttermination visi-
tation orders. See *In re K.H.*, Docket No. 2019-258, 2019
WL 6048913, *3 (Vt. November 14, 2019) (concluding
that trial court properly concluded that it had no author-
ity to order ongoing contact posttermination in light of
statute that provided for postadoption contact orders
pursuant to agreement between biological parents and
intended adoptive parents); see also *In re Hailey ZZ.*,
19 N.Y.3d 422, 437, 972 N.E.2d 87, 948 N.Y.S.2d 846
(2012) ("the open adoption concept would appear to
be inconsistent with this [s]tate's view as expressed by
the [l]egislature that adoption relieves the biological
parent of all parental duties toward and of all responsi-
bilities for the adoptive child over whom the parent shall
have no rights" (internal quotation marks omitted)).

To the extent that the court in *In re Ava W.* relied
on *Michaud* and a sentence in the statutes preserving
common-law postadoption visitation agreements as
support for its interpretation of § 46b-121 (b) (1), that
reliance is misplaced. *Michaud* involved a common-law
breach of contract action, predating the cooperative
adoption agreement statutes, that challenged the adop-
tive parents' repudiation of a visitation agreement exe-
cuted after parental rights were terminated. *Michaud* v.
*Wawruck*, supra, 209 Conn. 408–409. It hardly provides

evidence that the legislature had not "expressly abro-
gated the [court's] authority to make or enforce orders
regarding posttermination visitation.'' *In re Ava W.*,
supra, 336 Conn. 576. As I previously explained, there
was no such common-law authority to be abrogated.
Moreover, *Michaud* did not involve the exercise of the
court's authority in a juvenile matter but, rather, its
authority to enforce a common-law contract. The legis-
lature's subsequent adoption of language providing that
"[cooperative postadoption] agreement[s] shall be *in
addition to those under common law*''; (emphasis
added) General Statutes § 17a-112 (b); accord General
Statutes § 45a-715 (h); similarly refers to extrajudicial
agreements, like the agreement in *Michaud*, between
private parties. This language does not refer to postter-
mination visitation compelled over the objection of the
statutory parent or the child's adoptive parents. See *In
re Shane F.*, Docket Nos. 26623-1-111 and 26624-1-111,
2009 WL 44818, *5–6 (Wn. App. January 8, 2009) (deci-
sion without published opinion, 148 Wn. App. 1004)
(statute providing that " '[n]othing in this chapter shall
be construed to prohibit the parties to a proceeding
under this chapter from entering into agreements
regarding communication with or contact between
child adoptees, adoptive parents, and a birth parent or
parents' '' did not support judicially mandated post-
adoption visitation).

In sum, there is not a single case or a shred of histori-
cal or textual evidence demonstrating that trial courts
had authority to order posttermination visitation under
the common law or were given such authority by stat-
ute. The historical record reflects that § 46b-121 (b) (1)
had never previously been utilized by the courts to
permit an order of posttermination visitation; it had
been used to issue orders to address matters that arose
during the course of child protection proceedings as
they continued toward their ultimate and final goal: a

In re Annessa J.

safe, permanent situation for the child—either reunification with a parent or the placement in a permanent home, preferably an adoptive home—and an end to the state's involvement. This provision allows the court to direct orders to the commissioner, parents whose rights are still intact and who are still striving to achieve restoration of the normal family unit, foster parents, and any other person who continues to owe some duty to the child.

C

The interpretation of § 46b-121 (b) (1) as allowing posttermination parental rights to visitation is also inconsistent with the policies that the legislative scheme is intended to implement. It is important to recognize at the outset that there should be few cases in which court-ordered, posttermination visitation could be deemed "necessary or appropriate to secure the [child's] welfare''; General Statutes § 46b-121 (b) (1); *regardless of what that standard means*. There are three principal reasons why this is so. The first is the nature of the clear and convincing proof that is required to terminate parental rights. This proof consists not merely of evidence that the parent has engaged in conduct that was harmful, or is likely to cause harm, to the child and has shown unwillingness or incapacity to change that conduct;[12] see General Statutes § 17a-112

---

[12] Let me remind the reader of the regrettable situations that warrant termination of parental rights: abandonment of the child; the parent's failure (after months of reunification efforts provided by the department) to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child; the child has been denied, by reasons of an act or acts of parental commission or omission, including, but limited to, sexual molestation or exploitation, severe physical abuse or a pattern of abuse, the care, guidance, or control necessary for the child's well-being; the lack of an ongoing parent-child relationship, which means the lack of a relationship that ordinarily develops as a result of a parent's having met on a day-to-day basis the needs of the child, and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child; the parent has killed, through deliberate, nonaccidental act, another child of the

In re Annessa J.

(j); but also that termination of parental rights is in the child's best interest. See General Statutes § 17a-112 (j); see also General Statutes § 45a-717 (g). Most of these cases do not present circumstances in which an order of posttermination visitation would ever be appropriate. The second reason is that, in the absence of actual abuse, the court would be less likely to find that termination of parental rights is in the child's best interest if the child's chances of securing a permanent placement are remote (e.g., child is much older, has severe behavioral or medical issues, etc.), the child retains a strong attachment to the parent, and the parent has, to the best of his or her ability, maintained contact with the child. See General Statutes § 17a–112 (k) (4) through (7);[13] see also S. Williams, Child Trends, State-Level

parent, or has requested, commanded, importuned, attempted, conspired, or solicited such killing, or has committed an assault, through deliberate, nonaccidental act, that resulted in serious bodily injury of another child of the parent; or the parent committed an act that constitutes sexual assault, as defined in our law, or has compelled a spouse or cohabitor to engage in sexual intercourse by the use of force or by the threat of the use of force, if such act resulted in the conception of the child. See General Statutes §17a-112 (j).

[13] General Statutes § 17a-112 (k) provides in relevant part: "Except in the case where termination of parental rights is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding . . . (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

In re Annessa J.

Data for Understanding Child Welfare in the United
States (February 28, 2022), available at https://
www.childtrends.org/publications/state-level-data-for-
understanding-child-welfare-in-the-united-states    (last
visited June 16, 2022) (providing federal fiscal year 2018,
state by state statistics of children adopted and waiting
to be adopted, demonstrating that, as age increases,
average length of stay in foster care waiting to be
adopted increases). One option if ongoing contact is
appropriate is for the court to appoint a permanent
legal guardian for the child in lieu of termination; see
General Statutes § 46b-129 (j); a status that would allow
the court to exercise its authority under § 46b-121 (b)
(1) to order visitation.[14] See, e.g., *In re Mason S.*, Supe-
rior Court, judicial district of Hartford, Juvenile Matters,
Docket No. H12-CP-17-16981-A, (May 30, 2017); *In re
Nyara J.*, Superior Court, judicial district of Hartford,
Juvenile Matters, Docket Nos. H12-CP-08-012242-A and
H12-CP-08-012243-A (September 22, 2016). The third
reason is that, if the court nonetheless orders termina-
tion under such circumstances, the commissioner, as
statutory parent, is likely to voluntarily allow some form
of posttermination contact or communication between
the parent and the child, if it is in the child's best interest
and the parent is willing and able to act in a cooperative
manner. Thus, cases in which court-ordered, posttermi-
nation visitation could be viewed as necessary or appro-
priate to secure the child's welfare will likely be a
distinct minority. Whether the legislature intended to
provide authority for the trial court to order posttermi-
nation visitation must, therefore, be considered against
this backdrop.

[14] Although the permanent legal guardianship may be terminated if the
guardian becomes unsuitable, the parent may not move for termination. See
General Statutes § 46b-129 (j) (7). The legislature's creation of the permanent
legal guardianship suggests that it contemplated situations in which the
parent lacks capacity to care for the child but should be permitted some
ongoing contact.

This court also should consider whether court-ordered, posttermination visitation would be generally consistent with the purpose of termination of parental rights. Cf. *In re Eden F.*, 250 Conn. 674, 692, 741 A.2d 873 (1999) (considering whether court's interpretation of § 17a-112 was in accordance with public policy declared by legislature in General Statutes § 17a-101). Termination of parental rights is intended to foster permanency and stability for the child. See, e.g., *In re Nevaeh W.*, 317 Conn. 723, 731–33, 120 A.3d 1177 (2015); *In re Davonta V.*, 285 Conn. 483, 494–96, 940 A.2d 733 (2008). Adoption is the preferred outcome; see *In re Adelina A.*, 169 Conn. App. 111, 121 n.14, 148 A.3d 621 ("[t]he Adoption and Safe Families Act (ASFA), Pub. L. No. 105-89, 111 Stat. 2115 (1997), and parallel state law . . . [have] established a clear preference for termination followed by adoption when reunification with a parent is not a viable permanency plan"), cert. denied, 323 Conn. 949, 169 A.3d 792 (2016); and, in accordance with federal law, Connecticut's statutory scheme provides an expedited schedule to make a permanent placement for a child for whom reunification is not an appropriate option. See id., 122–23.

Just as failure to terminate parental rights may have an adverse effect on a child's need for permanency and stability, so, too, may permitting posttermination visitation, particularly with children who are too young or psychologically frail to understand that the parent they continue to have contact with will never resume his or her parental role. The schism created by any conflict between the parent and a foster or adoptive parent also can prove disruptive to the children and their caretakers or new family.[15] See, e.g., *In re Omar*

[15] Even when parents are cooperative during pretermination visitation, such conduct will not necessarily be an accurate predictor of their conduct posttermination, after the incentive to cooperate to obtain reunification has been removed. Moreover, given that almost all visitation ordered prior to termination is supervised, posttermination visitation likely would also need to be supervised. It is an open question as to how such supervision would

In re Annessa J.

*I.*, 197 Conn. App. 499, 533, 231 A.3d 1196 (respondent father sent threatening e-mail to foster parents accusing them of emotional abuse and of alienating children from him), cert. denied, 335 Conn. 924, 233 A.3d 1091, cert. denied sub nom. *Ammar I.* v. *Connecticut*, U.S. , 141 S. Ct. 956, 208 L. Ed. 2d 494 (2020); *In re Joseph W.*, 53 Conn. Supp. 1, 79, 79 A.3d 155 (2012) (respondent parents drove to foster home, pounded on doors, shouted child's name, and demanded to know where child was, terrifying foster parents' child who was home alone), aff'd, 146 Conn. App. 468, 78 A.3d 276, cert. denied, 310 Conn. 950, 80 A.3d 909 (2013) and cert. denied, 310 Conn. 950, 80 A.3d 909 (2013); *In re Guilherme F.*, Superior Court, judicial district of Middlesex, Child Protection Session at Middletown, Docket Nos. H12-CP-04-010032-A and H12-CP-05-010590-A (January 3, 2008) (foster placement was disrupted when respondent mother made referral to department hotline making unsubstantiated allegations that children were being abused by foster parents). Posttermination visitation thus poses the risk of impinging on foster families and deterring their willingness to foster children.

Similarly, posttermination visitation may derail adoption or reduce the children's opportunities to be placed in permanent homes and, if they are adopted, may threaten the integrity of the new family unit. See *People ex rel. M.M.*, 726 P.2d 1108, 1125 (Colo. 1986) (characterizing posttermination visitation order as "impediment to adoption"). Prospective adoptive parents may be reluctant or unwilling to facilitate contact between a child and a former parent who has exhibited problematic behaviors that justified the loss of his or her parental rights.[16] The prospect of having to initiate a court

be provided, who would provide supervision, where such visits would take place, and who would assume its cost.

[16] A recent Superior Court decision exemplifies the dilemma facing trial judges as a result of this court's decision in *In re Ava W.* and the resulting consequences of posttermination visitation orders. Judge Bernadette Conway, who, until her recent retirement, had been the chief administrative

In re Annessa J.

action to revoke the visitation order or getting hauled
into court to answer a motion for contempt for refusing
to provide postadoption visitation may be a significant
deterrent to adoption. The commissioner may thus feel
compelled to limit the department's pool of potential
adoptive parents to those who will agree to an open
adoption.

Even under the best of circumstances, it is inevitable
that disagreements and changes in circumstances will
arise after posttermination visitation commences. It is
not speculative to assume that compelled orders of
visitation following a contested termination of parental
rights will lead to repetitive motions for contempt and

judge for juvenile matters, concluded that she was obliged under the change
in the law resulting from the court's holding in *In re Ava W.* and the particular
circumstances of the case before her to issue an order of posttermination
visitation. See *In re Roxanne F.*, Docket Nos. N05-CP-19-023890-A, N05-CP-
19023891-A and N05-CP-19-023892-A, 2022 WL 375459 (Conn. Super. January
18, 2022). Judge Conway noted that, although the respondent mother and
the children's paternal aunt, the identified preadoptive parent, would con-
tinue their "effective collaborative efforts" to allow for contact between the
mother and the children such that no posttermination visitation order was
necessary, there was the possibility that "a scenario could evolve wherein
one or more of the children are adopted by someone other than [the] paternal
aunt and by someone not supportive of postadoption visitation/contact
between [the] respondent mother and the child[ren]." Id., *12. Because of
that potential uncertainty, Judge Conway regrettably felt that she had no
choice under *In re Ava. W.* but to enter a posttermination visitation order
directed not only to the paternal aunt but also to any future adoptive parent.
Id. Judge Conway expressed reservations about the propriety of subjecting
nonparties to court orders and the court's continuing jurisdiction: "An adop-
tive parent's right to parent, free of unfettered outside interference, is indis-
tinguishable from a birth parent's right to do the same. Under our state's
statutory framework, prior to [*In re*] *Ava W.*, once adoption is effectuated,
[department] involvement ends, and absent rare exceptions, the . . . court's
jurisdiction over the child[ren] and the newly named adoptive parent(s)
ceases. . . . [The] court's posttermination visitation orders necessarily
[leave] intact the trial court's jurisdiction and de facto subjects the adoptive
parent(s) to the court's continuing jurisdiction and court orders, until the
child[ren] reach the age of majority, notwithstanding the adoptive parent's
nonparty status and a lack of prior notice and opportunity to be heard prior
to the issuance of the court's orders." Id., *12 n.23.

In re Annessa J.

modification. This consequence will require the assignment of more judges to our already overburdened docket for juvenile matters. It also will impose a burden on foster parents and adoptive parents to initiate court action to modify or revoke the visitation order or require them to respond to court action initiated by the former parent.[17]

I am aware that there is some legal scholarship supporting the position that maintaining a relationship with the biological family can be beneficial to a child following termination of parental rights. See, e.g., National Council of Juvenile and Family Court Judges, Forever Families: Improving Outcomes by Achieving Permanency for Legal Orphans, (April, 2013) p. 18, available at https://www.ncjfcj.org/wp-content/uploads/2013/04/LOTAB_3_25_13_newcover_0.pdf; K. Foehrkolb, Comment, "When the Child's Best Interest Calls for It: Post-Adoption Contact by Court Order in Maryland," 71 Md. L. Rev. 490, 524–28 (2012); A. Williams, Note, "Rethinking Social Severance: Post-Termination Contact Between Birth Parents and Children," 41 Conn. L. Rev. 609, 617–19 (2008); see also *State ex rel. Amy M.* v. *Kaufman*, 196 W. Va. 251, 260, 470 S.E.2d 205 (1996) ("even where termination of parental rights is justified, a continued relationship between parent and child by means of post-termination visitation may be valuable to the child's emotional well-being"). In response, I offer two observations about ways in which such a relationship could be fostered that are likely to be far less intrusive and disruptive to the child's permanent placement than court-ordered visitation with the former parent. First,

---

[17] The right to appointed counsel in such proceedings is not certain. Although adoptive parents *may* be entitled to appointed counsel; see General Statutes § 46b-136 (a) (authorizing appointment of "attorney to represent . . . the child's or youth's parent or parents or guardian, or other person having control of the child or youth, if such judge determines that the interests of justice so require"); they will be assessed costs of such representation if they are not indigent. See General Statutes § 46b-136 (b).

343 Conn. 642 JUNE, 2022 705

In re Annessa J.

a relationship with the child's biological family may be fostered through connections with relatives other than the child's former parent. There are statutory provisions that address sibling contact, for example. See footnote 10 of this opinion. Second, a less intrusive connection could be maintained with a former parent (or other relatives) by means other than face-to-face visitation. As the cooperative postadoption agreement statutes recognize, a relationship may be maintained through "*communication or* contact . . . ." (Emphasis added.) General Statutes § 17a-112 (b) and (c); General Statutes § 45a-715 (h) and (i). Presumably, visitation is contact. Communication would include oral or written communication, whether by phone, mail, or electronic means.

Ultimately, however, "it is a question of public policy how best to strike the appropriate balance between and among the competing values and interests at stake, *and*, '[*i*]*n areas where the legislature has spoken . . . the primary responsibility for formulating public policy must remain with the legislature.' State* v. *Whiteman*, 204 Conn. 98, 103, 526 A.2d 869 (1987)." (Emphasis added.) *In re Tresin J.*, 334 Conn. 314, 340, 222 A.3d 83 (2019) (*Ecker, J.*, concurring). The legislature has spoken with regard to the issue of posttermination visitation. "Th[e] definition [of termination of parental rights] does not confer upon the courts any license to go beyond the statutory language in this delicate and sensitive area." *In re Juvenile Appeal (83-BC)*, 189 Conn. 66, 89, 454 A.2d 1262 (1983) (*Healey, J.*, dissenting); see also *In re Hailey ZZ.*, supra, 19 N.Y.3d 438 (recognizing that legislature was "the entity best suited to balance the critical social policy choices and the delicate issues of family relations involved in such matters . . . [and it] has not sanctioned judicial imposition of posttermination contact where parental rights are terminated after a contested proceeding" (citation omitted; internal quotation marks omitted)).

In re Annessa J.

## II

The court's holding in *In re Ava W.*, however, is presently controlling precedent. There are nonetheless two steps that this court could take to clarify that decision to minimize some of the concerns that I have identified.

The first step would be to give a contextual meaning to the "necessary or appropriate" standard under § 46b-121 (b) (1) that fits the nature of the order at issue. These terms lack any fixed meaning, and what is necessary or appropriate in any given case may differ. "Appropriate" may be a perfectly serviceable standard when assessing whether to order the department to provide the child with a computer for school work; it is less so when assessing whether posttermination visitation should be ordered in light of the concerns discussed in part I C of this opinion.

I would interpret posttermination visitation over the objection of the presumptively fit statutory parent to be "appropriate" only when it is "necessary" (or simply that "necessary" is the governing standard in this context).[18] In turn, I would at least interpret "necessary" to be functionally equivalent to the standard that this court adopted for ordering third-party visitation over a presumptively fit parent's objection under General Statutes § 46b-59. See *Roth* v. *Weston*, 259 Conn. 202, 234–35, 789 A.2d 431 (2002). Under that standard, a

---

[18] Although § 46b-121 (b) (1) is phrased in the conjunctive ("necessary or appropriate"), it seems unlikely that the legislature's intention was to make either standard a sufficient basis to issue an order in any given situation (i.e., a choice of standards). Rather, it is likely that the legislature recognized that "necessary" might be the proper standard to guide the exercise of authority in some circumstances and "appropriate" might be the proper standard in others. "Appropriate" is such a broad term that it is difficult to envision any circumstance in which the court's exercise of authority could be deemed necessary but not appropriate. By authorizing the court also to issue orders when "necessary," the legislature acknowledged that necessary should be the sole governing standard in some circumstances.

parent can demonstrate that posttermination visitation is necessary by showing (1) that he or she presently has a parent-child relationship with the child,[19] and (2) that "denial of the visitation will cause real and significant harm to the child. . . . [T]hat degree of harm requires more than a determination that visitation would be in the child's best interest. It must be a degree of harm analogous to the kind of harm contemplated by [General Statutes] §§ 46b-120 and 46b-129, namely, that the child is 'neglected, uncared-for or dependent.' " Id. Mindful that the statutory parent's objection to visitation is not of constitutional dimension, as was the case in *Roth* v. *Weston*, supra, 230, I would reduce the burden of proof on these elements from *Roth*'s clear and convincing burden; see id., 230–31; to a preponderance of the evidence.[20]

The second step I would take is to make clear that any order of posttermination visitation will terminate *automatically* upon a court order approving an adoption agreement; notice of this potential occurrence would be incorporated into the final judgment terminating parental rights. Cf. *In re Noreen G.*, 181 Cal. App. 4th 1359, 1391–92, 105 Cal. Rptr. 3d 521 (2010) (court has no authority to order postadoption visitation), review denied, California Supreme Court, Docket No. S180958 (April 22, 2010). This rule would account for several important considerations. First, it would be consistent with the legislature's decision to sanction postadoption visitation only pursuant to a cooperative agreement, whether under the statute or common law. Second,

---

[19] The showing in connection with the first element would take into account some of the factors that the court must consider under § 17a-112 (k) to determine whether it is appropriate to terminate parental rights. See footnote 13 of this opinion.

[20] If this court is not inclined to adopt my second suggestion regarding postadoption visitation, the adoptive parent's objection to visitation would be of constitutional dimension; see General Statutes § 45a-731; and should be overcome only upon clear and convincing proof.

In re Annessa J.

it would remove the impediments to adoption that I identified in part I C of this opinion. Third, it would ensure that the constitutional rights of the adoptive (now legal) parents; see General Statutes § 45a-731; to decide what is in their child's best interest would be protected, shifting the burden to the former parents to prove that they can meet the *Roth* standard by clear and convincing evidence. See *People ex rel. M.M.*, supra, 726 P.2d 1125. (Court concluded that the trial court properly struck the provision in its original termination order authorizing continued visitation because the provision "could well have had the effect of depriving any future adoptive parents of full control over any decision regarding whether any contact should be allowed between [the respondent mother] and [her son] . . . . In the event [the son] is adopted, his adoptive parents will have the right to determine whether it is in his best interests to maintain contact with [the respondent mother].''); *In re Hailey ZZ.*, supra, 19 N.Y.3d 439 n.9 (''[s]urely, adoptive parents are the best arbiters of whether continued contact with the birth parent is in a child's best interests'').

For the foregoing reasons, I respectfully concur.